**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

EFG BANK AG, CAYMAN BRANCH;
WELLS FARGO BANK, NATIONAL
ASSOCIATION, as securities intermediary for
EFG BANK AG, CAYMAN BRANCH; DLP
MASTER TRUST; DLP MASTER TRUST II;
DLP MASTER TRUST III; GWG DLP
MASTER TRUST; GREENWICH
SETTLEMENTS MASTER TRUST; LIFE
FUNDING TRUST; PF PARTICIPATION
FUNDING TRUST; AND PALM BEACH
SETTLEMENT COMPANY,

              Plaintiffs,

           -against-

AXA EQUITABLE LIFE INSURANCE
COMPANY,

              Defendant.

---

Index No. 1:17-cv-04767-JMF

**SECOND AMENDED COMPLAINT**

Plaintiffs EFG Bank AG, Cayman Branch ("EFG") and Wells Fargo Bank, National Association ("Wells Fargo"), as securities intermediary for EFG (EFG and Wells Fargo together, "EFG Plaintiffs"), and Plaintiffs DLP Master Trust, DLP Master Trust II, DLP Master Trust III, GWG DLP Master Trust, Greenwich Settlements Master Trust, Life Funding Trust, PF Participation Funding Trust, and Palm Beach Settlement Company (collectively, "EAA Plaintiffs," and together with EFG Plaintiffs, "Plaintiffs"), by and through their attorneys, file this Second Amended Complaint against Defendant AXA Equitable Life Insurance Company ("AXA" or "Defendant"), and allege as follows:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) and (3) because (a) the action involves plaintiffs who are citizens of South Dakota, Delaware, Germany, and Switzerland (as described fully below), and a defendant that is a citizen of the state of New York; and (b) the amount in controversy exceeds $75,000, exclusive of interest and costs.

2.      This Court has personal jurisdiction over AXA because, upon information and belief, AXA has its principal place of business in New York, New York and regularly conducts and transacts business in this state.

3.      Venue is proper pursuant to 28 U.S.C. § 1391(a)(1) because, upon information and belief, AXA resides in the Southern District of New York.

## NATURE OF THE ACTION

4.      Plaintiffs bring this action seeking compensatory and punitive damages, equitable relief, and attorneys' fees based on AXA's unlawful increasing of the cost of insurance (sometimes referred to herein as "COI") rates on a targeted group of its in-force Athena Universal Life II ("AUL II") insurance policies (the "AUL II Policies"). This targeted group (the "Discriminated Group"), which includes Plaintiffs, consists of policyholders who own AUL II policies that (a) were issued on insureds who were 70 years old or older (issue age); and (b) have a face amount of $1,000,000 or more. By raising the cost of insurance rates without a proper basis and only on the Discriminated Group, AXA has breached the express and implied terms of

the AUL II Policies.

5.       The AUL II Policies are universal life insurance policies.  Universal life insurance is a form of life insurance also known as "flexible premium" adjustable life insurance.  Universal life insurance consists of two distinct components: (1) the life insurance component, for which the insurance company charges a cost to cover the risk of the insured's death (the cost of insurance); and (2) a savings component, where premiums paid in excess of the cost of insurance (and certain other policy charges) accumulate and earn interest at a rate that will not be lower than a guaranteed minimum crediting rate.

6.       Universal life insurance is designed to give policyholders flexibility, particularly with respect to the payment of premiums.  This can be demonstrated by comparing universal life insurance to whole life insurance.  With whole life insurance, a policyholder pays fixed monthly premium payments for the life of a policy.  These fixed monthly premium payments include an amount associated with the cost of actual insurance (*i.e.*, the cost for the insurance company to bear the risk of the insured's death) but also an additional amount intended to build up a "cash value" that earns interest over time.  In the insured's earlier years, the fixed monthly premium payments are typically far higher than the insured's actual risk of death, and most of the premiums are used to accumulate cash value that will be used to fund the death benefit in the later years of the insured's life, when the fixed monthly premiums are likely to be lower than the actual risk of death.  That is, the "cash value" build-up in the earlier years operates as a "reserve" to pay the death benefit in the later years.

7.       Universal life insurance "unbundles" these two components of a whole life insurance policy and allows policyholders to choose whether to pay just enough premiums to cover the risk of death (*i.e.*, pay solely for the life insurance) or pay more (subject to certain limitations) and build up a cash value that earns tax-deferred interest (which, among other things, can be used to pay for the cost of insurance in the future).

8.       Although there is no fixed monthly premium payment that is due, if the balance in the policy account is insufficient to cover the policy's monthly charges, which includes the cost

of insurance and certain other policy charges, the policy will enter a grace period and lapse unless additional premiums are paid.

9.      Universal life insurance policies have both guaranteed and non-guaranteed elements.  Guaranteed elements are fixed and determined at a specific time, such as when the policy was issued.  Non-guaranteed elements, on the other hand, are not fixed at a specific time and can be adjusted by the life insurance company under the terms of the policy.  An example of a guaranteed element is the guaranteed minimum crediting rate.  An example of a non-guaranteed element is the cost of insurance rate, which is the rate that AXA charges to bear the risk of the insured's death.  (Many universal life insurance policies refer to this as the "cost of insurance" rate because it is the rate that the insurance company charges purely for insurance coverage.)

10.      Although the AUL II Policies permit AXA to adjust the cost of insurance rates (by increasing or decreasing them), the AUL II Policies restrict AXA's ability to do so in at least three important ways.  First, AXA may only change cost of insurance rates based on "reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses."  Second, any change in cost of insurance rates must "be on a basis that is equitable to all policyholders of a given class."  Third, any change by AXA in the cost of insurance rates cannot "result in an interest crediting rate that is lower than that guaranteed in the policy."

11.      The most important assumption in life insurance is mortality.  Yet it is well-known in the life insurance industry that since AXA began issuing the AUL II Policies several years ago, in 2004, mortality has *improved*, not *worsened*.  Indeed, in 2015, the same year AXA announced it would be raising the cost of insurance rates, the National Center for Health Statistics reported that mortality had improved by 16.6% between 2000 and 2014.[1]  The improvement in mortality has resulted in new life insurance mortality tables that would, if anything, support a *decrease*, not *increase*, in cost of insurance rates.  Despite this, AXA has increased cost of insurance rates, and it has done so by as much as 68%, in blatant breach of the

---

[1] Sherry L. Murphy, et al., *Mortality in the United States*, 2014, NCHS Data Brief No. 229, 5 (Dec. 2015).

AUL II Policies' express and implied terms and conditions.

12.     AXA also has attempted to justify its rate increase by claiming that low interest rates have resulted in lower than expected investment income for AXA.  But even if this were true, low interest rates would impact all AUL II Policies, not just those with issue ages of 70 and above and face amounts of $1,000,000 and above, and there is no logical or actuarially-based reason for singling out these policyholders for a rate increase.  Furthermore, lower investment returns should not justify a rate increase as high as 68%.

13.     Furthermore, as mentioned above, the AUL II Policies state that any change in cost of insurance rates "will be on a basis that is equitable to all policyholders of a given class." But instead of implementing a rate increase that is equitable to policyholders in a given class, AXA identified a new group of policyholders to be the target of its rate increase.  That group is the Discriminated Group and consists solely of policyholders who own policies with issue ages of 70 and above and face amounts of $1,000,000 and above.  Although AXA now refers to this group as a "class," upon information and belief, this so-called "class" did not exist at the time AXA designed the AUL II Policies and AXA only created it in a brazen attempt to circumvent the AUL II Policies' requirement that any rate increase be on a basis that is equitable to all policyholders of a given class.  In other words, knowing it could not treat policyholders within a class inequitably, AXA attempted to accomplish this result by redefining the classes themselves.

14.     Moreover, by drastically raising cost of insurance rates by as much as 68% on only the Discriminated Group, it is apparent that AXA seeks to force Plaintiffs and other members of the Discriminated Group either to (a) pay exorbitant premiums that AXA knows would no longer justify the ultimate death benefits, or (b) lapse or surrender their AUL II Policies and forfeit the premiums they have paid to date, thereby depriving policyholders of the benefits of their policies.  AXA, in turn, will make a huge profit—either through higher premium payments or by eliminating a large group of policies (through lapses or surrenders) and keeping the vast majority of the premiums that have been paid to date on them.  Indeed, AXA stated in its 2015 Form 10-K filed with the Securities and Exchange Commission ("SEC") that it expected its

rate increase to result in a $46 million increase to net earnings in 2015 alone.  Later, however, AXA reported that it had realized this $46 million increase in just the first nine months of 2015.

15.     To better understand the basis for AXA's sudden and massive rate increase, counsel, on behalf of EAA Plaintiffs, attempted to obtain the information that AXA relied on to justify its rate increase, including AXA's original mortality and investment income assumptions and evidence of its alleged adverse mortality and investment income experience, but AXA refused to provide this information.  Counsel, on behalf of Plaintiffs, also made public records requests for this information to AXA's home state regulator, the New York State Department of Financial Services ("NYDFS"), but AXA objected to NYDFS providing such records, claiming the information is confidential and "trade secret[]."

16.     AXA's misconduct, as described more fully herein, constitutes not only express breaches of the AUL II Policies, but also breaches of the implied covenant of good faith and fair dealing.  Plaintiffs therefore seek compensatory and punitive damages, as well as equitable relief and attorneys' fees.

17.     Indeed, in apparent response to complaints about AXA's rate increase, NYDFS recently proposed a new regulation to protect policyholders "from unjustified life insurance premium increases."[2]  The regulation would give NYDFS the opportunity to review potential rate increases by requiring life insurance companies to notify NYDFS "at least 120 days prior to an adverse change in non-guaranteed elements of an in-force life insurance or annuity policy."[3] The regulation also would require insurers to notify policyholders "at least 60 days prior to an adverse change in non-guaranteed elements of an in-force life insurance or annuity policy."[4]  In addition, the regulation would require insurers to "establish board-approved criteria for determining non-guaranteed charges or benefits" and would mandate a NYDFS review of "the anticipated experience factors and non-guaranteed elements for existing policies whenever the

---

[2] *See* Press Release, NYDFS, *DFS Proposes New Regulation to Protect New Yorkers from Unjustified Life Insurance Premium Increases* (Nov. 17, 2016), http://www.dfs.ny.gov/about/press/pr1611171.htm.
[3] *Id.*
[4] *Id.*

non-guaranteed elements on newly issued policies are changed."[5]  The regulation defines experience factors as "investment income, mortality, morbidity, persistency, or expense that represents the insurer's financial experience on a policy."[6]  "Profit margin is not an experience factor."[7]

18.      In announcing the proposed regulation in a press release dated November 17, 2016, NYDFS Superintendent Maria Vullo declared that New York "will not stand by and provide life insurers free reign to implement unjustified cost of insurance increases on New Yorkers simply to boost profits."[8]

19.      An article in *The Wall Street Journal* published the same day notes that although the regulation would apply only in New York, it "could be widely copied by other insurance departments."[9]

## THE PARTIES

20.      Plaintiff Wells Fargo is a national banking association with its principal place of business in Sioux Falls, South Dakota.  Plaintiff EFG Bank AG, Cayman Branch is a Swiss banking corporation with its principal place of business in Switzerland; Cayman Branch refers to a branch office in the Cayman Islands.  EFG is the ultimate owner and beneficiary of certain of the life insurance policies at issue in this case, which EFG holds in a security account maintained by Wells Fargo, as securities intermediary for EFG pursuant to a Securities Account Control Agreement, dated as of November 7, 2007, between EFG Bank AG, Guernsey Branch and Wells Fargo, as modified by that certain Assignment and Amendment Agreement dated as of June, 2010, by and among EFG, EFG Bank AG, Guernsey Branch, and Wells Fargo (as modified, the "SACA").[10]  Under the SACA, each life insurance policy at issue constitutes a "Financial Asset"

---

[5] Life Insurance & Annuity Non-Guaranteed Elements §48.2, 11 NYCRR 48 (proposed Nov. 17, 2016), http://www.dfs.ny.gov/insurance/r_prop/rp210txt.pdf.
[6] *Id.*
[7] *Id.*
[8] Press Release, NYDFS, *supra* note 2.
[9] Leslie Scism, *New York Regulator Aims to Require Life Insurers Justify Higher Rates on Old Policies*, Wall St. J. (Nov. 17, 2016), http://www.wsj.com/articles/new-york-regulator-aims-to-require-life-insurers-justify-higher-rates-on-old-policies-1479394201.
[10] Here, as securities intermediary, Wells Fargo is "a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity."  U.C.C. § 8-102(a)(14)(ii).

that Wells Fargo, as securities intermediary, has credited to the securities account.  EFG is the "entitlement holder" and is entitled to exercise the rights that comprise each Financial Asset credited to the securities account.  EFG owns the ultimate financial interests in the policies.  Wells Fargo, as securities intermediary for EFG, is identified as the owner and beneficiary on the records of the insurance company.

21.     Plaintiff DLP Master Trust is a Delaware statutory trust.  The trustee of DLP Master Trust is Wells Fargo.  The Delaware trustee of DLP Master Trust is Wells Fargo Delaware Trust Company, National Association ("Wells Fargo Delaware Trust Company"), a national banking association.  The certificate holder of DLP Master Trust is EAA DLP I LLP.  EAA DLP I LLP is a Delaware limited liability partnership.  The partners of EAA DLP I LLP are Erste EAA Anstalt öffentlichen Rechts & Co. KG ("EAA Anstalt") and LS EAA Holdings, LLC.  LS EAA Holdings, LLC is a Delaware limited liability company whose sole member is EAA Anstalt.  EAA Anstalt is regarded as a juridical person under the laws of Germany.

22.     Plaintiff DLP Master Trust II is a Delaware statutory trust.  The trustee of DLP Master Trust II is Wells Fargo.  The Delaware trustee of DLP Master Trust II is Wells Fargo Delaware Trust Company.  The certificate holder of DLP Master Trust II is EAA DLP II LLP.  EAA DLP II LLP is a Delaware limited liability partnership.  The partners of EAA DLP II LLP are EAA Anstalt and LS EAA Holdings, LLC.  LS EAA Holdings, LLC is a Delaware limited liability company whose sole member is EAA Anstalt.

23.     Plaintiff DLP Master Trust III is a Delaware statutory trust.  The trustee of DLP Master Trust III is Wells Fargo.  The Delaware trustee is Wells Fargo Delaware Trust Company.  The certificate holder of DLP Master Trust III is EAA DLP III LLP.  EAA DLP III LLP is a Delaware limited liability partnership.  The partners of EAA DLP III LLP are EAA Anstalt and LS EAA Holdings, LLC.  LS EAA Holdings, LLC is a Delaware limited liability company whose sole member is EAA Anstalt.

24.     Plaintiff GWG DLP Master Trust is a Delaware statutory trust.  The trustee of GWG DLP Master Trust is Wells Fargo.  The Delaware trustee of GWG DLP Master Trust is

Wells Fargo Delaware Trust Company.  The certificate holder of GWG DLP Master Trust is EAA LAT II LLP.  EAA LAT II LLP is a Delaware limited liability partnership.  The partners of EAA LAT II LLP are EAA Anstalt and LS EAA Holdings, LLC.  LS EAA Holdings, LLC is a Delaware limited liability company whose sole member is EAA Anstalt.

25.     Plaintiff Greenwich Settlements Master Trust is a Delaware statutory trust.  The trustee of Greenwich Settlements Master Trust is Wells Fargo.  The Delaware trustee of Greenwich Settlements Master Trust is Wells Fargo Delaware Trust Company.  The certificate holder of Greenwich Settlements Master Trust is EAA Greenwich LLP.  EAA Greenwich LLP is a Delaware limited liability partnership.  The partners of EAA Greenwich LLP are EAA Anstalt and LS EAA Holdings, LLC.  LS EAA Holdings, LLC is a Delaware limited liability company whose sole member is EAA Anstalt.

26.     Plaintiff Life Funding Trust is a Delaware statutory trust.  The trustee of Life Funding Trust is Wells Fargo.  The Delaware trustee of Life Funding Trust is Wells Fargo Delaware Trust Company.  The certificate holder of Life Funding Trust is EAA LAT ABC LLP. EAA LAT ABC LLP is a Delaware limited liability partnership.  The partners of EAA LAT ABC LLP are EAA Anstalt and LS EAA Holdings, LLC.  LS EAA Holdings, LLC is a Delaware limited liability company whose sole member is EAA Anstalt.

27.     Plaintiff PF Participation Funding Trust is a Delaware statutory trust.  The trustee of PF Participation Funding Trust is Wells Fargo Delaware Trust Company.  The certificate holder of PF Participation Funding Trust is EAA PF LLP.  EAA PF LLP is a Delaware limited liability partnership.  The partners of EAA PF LLP are EAA Anstalt and LS EAA Holdings, LLC.  LS EAA Holdings, LLC is a Delaware limited liability company whose sole member is EAA Anstalt.

28.     Plaintiff Palm Beach Settlement Company is a Delaware statutory trust.  The trustee of Palm Beach Settlement Company is Wells Fargo.  The Delaware trustee of Palm Beach Settlement Company is Wells Fargo Delaware Trust Company.  The certificate holder of Palm Beach Settlement Company is EAA Triskele LLP.  EAA Triskele LLP is a Delaware limited

liability partnership.  The partners of EAA Triskele LLP are EAA Anstalt and LS EAA Holdings, LLC.  LS EAA Holdings, LLC is a Delaware limited liability company whose sole member is EAA Anstalt.

29.     Upon information and belief, Defendant AXA Equitable Life Insurance Company is a New York corporation with its principal place of business in New York, New York, and AXA regularly conducts its business within this judicial district.

## FACTUAL BACKGROUND

A.     Plaintiffs Are Owners of AUL II Policies Subject to AXA's COI Increase

30.     EFG is the ultimate owner and beneficiary of 20 AUL II Policies that AXA issued between 2005 and 2006 and that are subject to the cost of insurance rate increase (the "EFG Policies").  The EFG Policies range in face amount from $1.75 million to $10 million and are listed on the attached **Exhibit 1**.  All of the EFG Policies were issued and delivered by AXA in the State of California.  A sample EFG policy, redacted for privacy, is attached hereto as **Exhibit 2** ("EFG Doe Policy").  As noted above, Wells Fargo is listed on AXA's records as the owner and beneficiary of the EFG Policies, but solely as securities intermediary for EFG.  EFG, as the entitlement holder, owns the ultimate financial interest in the EFG Policies.

31.     EAA Plaintiffs are the owners and beneficiaries of 53 AUL II Policies that AXA issued between 2004 and 2007 and that are subject to the cost of insurance rate increase (the "EAA Policies," and together with the EFG Policies, the "Plaintiff Policies").  The EAA Policies range in face amount from $1 million to $15 million and are listed on the attached **Exhibit 3**.  All of the EAA Policies were issued and delivered by AXA in the States of Alabama, Arizona, California, Delaware, Florida, Georgia, Michigan, Minnesota, New Jersey, New York, Oregon, Texas, Utah, and Vermont.  A sample EAA policy, redacted for privacy, is attached hereto as **Exhibit 4** ("EAA Doe Policy," and together with the EFG Doe Policy, the "Doe Policies").

32.     As is typical of universal life insurance policies, the Plaintiff Policies provide that they will remain in force as long as there are sufficient funds in the policy account each month to cover the monthly deductions described in the Plaintiff Policies.  The monthly deductions consist

of a premium charge, an administrative charge, and a cost of insurance charge, plus charges for any policy riders.  Any balance in the policy account that is left after the deductions are taken reflects the "Policy Account Value," which accrues interest at a rate that cannot be lower than the guaranteed minimum crediting rate (3% for the Doe Policies).  EFG Doe Policy, Ex. 2, at 1; EAA Doe Policy, Ex. 4, at 1.  If in any month there are insufficient funds in the account to cover the deductions, the policy will enter a grace period.  If additional premiums are not paid within the grace period, AXA will terminate, or lapse, the policy.  The grace period depends on the individual policy, but for the Doe Policies, it is 61 days.  *See* EFG Doe Policy, Ex. 2, at 7; EAA Doe Policy, Ex. 4, at 7.

33.     The largest and most significant charge under the AUL II Policies is the cost of insurance charge.  This charge, also known as the mortality charge, reflects the price that AXA charges to cover the risk of death.  The cost of insurance charge is determined by multiplying the cost of insurance rate times the net amount at risk.  The net amount at risk is the death benefit minus the policy account value.  The policy account value is deducted from the death benefit because, although the policy account value is part of the death benefit paid upon the insured's death, policyholders do not pay cost of insurance on policy account value, which is the savings component of the AUL II Policies and not the "insurance."

34.     The cost of insurance rates under a policy are based initially on certain characteristics of the insured, including her or his gender, age, and underwriting class (*i.e.*, preferred plus, preferred, standard, and substandard classes).  The cost of insurance rates increase every year as the insured ages.

35.     The Plaintiff Policies state that AXA "will determine cost of insurance rates from time to time" and that any change in the cost of insurance rates will be as described in the "Changes in Policy Cost Factors" provision.  EFG Doe Policy, Ex. 2, at 9; EAA Doe Policy, Ex. 4, at 9.  The "Changes in Policy Cost Factors" provision provides:

Changes in policy cost factors (interest rates we credit, cost of insurance deductions and expense charges) will be on a basis that is equitable to all policyholders of a given class, and will

be determined based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses.

EFG Doe Policy, Ex. 2, at 11; EAA Doe Policy, Ex. 4, at 11.

36.     The Plaintiff Policies also contain a promise to pay interest on the Policy Account Value.  EFG Doe Policy, Ex. 2, at 1; EAA Doe Policy, Ex. 4, at 1.  Although AXA sets the rate of interest, the rate can never be lower than the guaranteed minimum crediting rate, which is 3% for the Doe Policies.  EFG Doe Policy, Ex. 2, at 1; EAA Doe Policy, Ex. 4, at 1.  Furthermore, the Plaintiff Policies expressly state that any change in policy cost factors, which includes changes in cost of insurance rates, can "never result in an interest crediting rate that is lower than" the guaranteed minimum crediting rate.  EFG Doe Policy, Ex. 2, at 11; EAA Doe Policy, Ex. 4, at 11.

37.     Accordingly, among many other things, under the terms of the Plaintiff Policies, any change in the COI rates: (a) can only be "based on [AXA's] reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses"; (b) must be "equitable to all policyholders of a given class"; and (c) cannot result in a crediting rate lower than the guaranteed minimum crediting rate.

B.     AXA Raises Cost of Insurance Rates Solely on the Discriminated Group's Policies

38.     In October 2015, AXA began notifying the Discriminated Group that it was raising the cost of insurance rates on their AUL II Policies, including all of the Plaintiff Policies. Sample letters for the EFG Doe Policy and the EAA Doe Policy are attached hereto as **Exhibit 5** and **Exhibit 6**, respectively.  These letters stated that AXA was "adjusting your universal life insurance policy in a way that will increase the monthly cost-of-insurance (COI) deductions from your policy and which is likely to require payment of additional premium to help ensure that your policy will perform as previously illustrated."  Ex. 5, at 1; Ex. 6, at 1.  The letters further stated that an adjustment to the COI rates was "necessary" because AXA "reviewed [its] mortality and investment income expectations for Athena Universal Life II policies and . . .

-12-

determined that they are less favorable than was anticipated when the current schedule of COI rates was established," which is consistent with other statements AXA has made publicly regarding the purported bases for the rate increase.  Ex. 5, at 1; Ex. 6, at 1.[11]

39.    AXA's letters did not say how much the rate increase would be or explain how its mortality and investment income assumptions had changed.  Nor did it say what policies or policyholders were subject to a rate increase.  The range of the increase in cost of insurance rate was later calculated to be between approximately 24% to as high as 68%.

40.    In addition to the Notice Letters, a "Frequently Asked Questions" ("FAQ") document that AXA released to brokers and agents disclosed that the COI rate increase was targeted solely at the Discriminated Group.[12]  Although the FAQ stated that "the impact of changes in our future mortality and investment income expectations was most pronounced for th[is] class of policies," AXA did not explain how or why its changes were "most pronounced" for this group of policies.[13]

41.    In December 2015, counsel, on behalf of EAA Plaintiffs, sent public records requests for information about AXA's rate increase to state insurance regulators, including AXA's home state regulator, NYDFS.  NYDFS responded that it had documents responsive to counsel for the EAA Plaintiffs' requests but that AXA had objected to NYDFS producing those documents, claiming they were confidential and trade secret.  After further correspondence, NYDFS produced a handful of redacted documents that did not show any changes in AXA's mortality and investment income assumptions or the reasons for the cost of insurance changes.

42.    On August 17, 2016, EFG sent a similar public records request to NYDFS. Similar to its response to counsel for EAA Plaintiffs, NYDFS responded to EFG's public records request by producing a handful of redacted documents.  Again, those redacted documents did not show any changes in AXA's mortality and investment income assumptions or the reasons for the

---

[11] *See also* AXA Equitable Life Ins. Co., Quarterly Report (Form 10-Q) 15, 77 (Nov. 11, 2016); FAQs: *Athena Universal Life II COI Rate Change* at 2, available at http://premierbrokerage.com/wp-content/uploads/AXA-COI-Increase.pdf (last visited Dec. 26, 2016).

[12] *FAQs: Athena Universal Life II COI Rate Change*, *supra* note 11, at 2.

[13] *Id.*

cost of insurance changes.

43.     Thus, Plaintiffs have yet to receive, either from AXA itself or from AXA's state insurance regulators, information evidencing the bases for AXA's COI rate increases.  Because no one but AXA and its regulators have this information, AXA's refusal to provide the information has prevented policyholders like Plaintiffs from verifying the accuracy of AXA's representations that its rate increase is justified by changes in assumptions as to mortality and investment income.  It is likely for this very reason that NYDFS proposed its new regulation, which would require life insurance companies like AXA to notify NYDFS and policyholders in advance of any adverse change in the non-guaranteed elements of an in-force life insurance policy and would mandate regulatory review of the anticipated experience factors, such as mortality and investment income.

44.     Regardless, it is apparent that AXA's rate increase breaches the terms of the Plaintiff Policies in at least four ways.  *First*, the rate increase is not "equitable to all policyholders of a given class."  *Second*, the rate increase is not "based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses."  Rather, Plaintiffs are informed and believe, and on that basis allege, that in raising COI rates, AXA considered factors that AXA cannot consider under the Plaintiff Policies.  *Third*, the rate increase impermissibly attempts to circumvent the minimum guaranteed crediting rate under the Plaintiff Policies.  *Fourth*, the rate increase breaches the implied covenant of good faith and fair dealing that exists in every insurance contract.

C.      The Rate Increase Is Not Equitable to All Policyholders in a Class

45.     The only "class" referred to in the Plaintiff Policies is the "Rating Class" or "class of risk"  *See, e.g.*, EFG Doe Policy, Ex. 2, at 3, 12, 13; EAA Doe Policy, Ex. 4, at 3, 12, 13.  In the AUL II Product Guide, which AXA distributed to its sales force, AXA refers to Rating Classes as "Underwriting Classes," but they appear to refer to the same grouping of policies.  *See* AUL II Product Guide, at 15.  A copy of the AUL II Product Guide is attached hereto as **Exhibit 7**.

46.    The Underwriting Classes are (i) Preferred Plus Non-Tobacco User; (ii) Preferred Non-Tobacco User; (iii) Preferred Tobacco User; (iv) Standard Non-Tobacco User; (v) Standard Tobacco User; and (vi) Substandard letter rating classes C, D, E, and F, Non-Tobacco and Tobacco User.  AUL II Product Guide, Ex. 7, at 15.  These classes represent a range of mortality risks, with Preferred Plus representing the lowest mortality risk to AXA.

47.    Issue age and face amount are not characteristics of the Rating or Underwriting Class, although only certain issue ages qualify for a particular Underwriting Class.  For example, Preferred Plus is limited only to issue ages of 18 to 80, while Preferred is available to anyone from age 0 to 85.  Thus, the Preferred and Preferred Plus Underwriting Classes consist of AUL II Policies with issue ages 70 and above as well as AUL II Policies with issue ages 69 and below.  These Underwriting Classes also consist of AUL II Policies with face amounts of $1 million and above as well as AUL II Policies with face amounts of $999,999 and below.

48.    AXA's rate increase violates the provision that any change in cost of insurance rates be equitable to all policyholders within a class because the rate increase applies only to some, rather than all, members of an Underwriting Class (those with issue ages of 70 and above and face amounts of $1 million and above).  For example, some members of the Preferred and Preferred Plus rating classes received a cost of insurance rate increase while others did not.  The same holds true for every other Rating or Underwriting Class.

49.    There also is no equitable or actuarial basis for singling out policies with issue ages of 70 and above and face amounts of $1 million and above.  This is particularly true with respect to the alleged adverse changes in AXA's investment income expectations.  If, as AXA contends, it expects to receive less investment income due to lower interest rates, it would expect to receive less investment income for all AUL II Policies regardless of their issue ages or face amounts.  Indeed, interest rates would have a greater impact on AUL II Policies with *lower* issue ages, not *higher* issue ages, because AXA would expect to realize the shortfall in expected investment income over the course of many more years for AUL II Policies with lower issue ages.  Although in a different context, even AXA itself has recognized this generally applicable

principle.  In the AUL II Product Guide, AXA expressly acknowledges that interest rate assumptions have a greater impact on AUL II Policies issued to younger insureds (*i.e.*, those whose policies will be longer in duration).  It states:

> Note that interest rates credited on a UL policy are *less important* in the sales illustration on a 75-year-old than they are on a 35-year-old since the illustration generally shows payments and policy values to age 120, (although the focus is often on age 100) and compounding over 85 years makes much more of a difference than over 45 years.  *Thus, there is relatively less interest rate risk on Athena II at older ages than at younger ages.*

AUL II Product Guide, Ex. 7, at 1 (emphasis added).

50.     Nor does it appear based on A/E ratios that the AUL II Policies have experienced worse mortality for policies with issue ages of 70 and above and face amounts of $1 million and above.  The A/E ratio is the actual to expected ratio, and reflects an insurance company's actual experience compared to its expected experience.  Upon information and belief, AXA's A/E mortality ratios for policies with issue ages of 70 and above and face amounts of $1 million and above are *lower than* the A/E mortality ratios for policies with issue ages of 69 and below and face amounts of $999,999 and less.  In other words, upon information and belief, AXA's mortality experience for the Discriminated Group has been more favorable than it has been for AXA's other AUL II Policies, which were not subject to the cost of insurance rate increase.

51.     Thus, not only is AXA's rate increase not equitable to all policyholders within a given class, the rate increase appears to target a group of policies that have been *more favorable to AXA* than those that did not receive a rate increase.  For this and other reasons, Plaintiffs believe that AXA had other undisclosed and improper motives for targeting the Discriminated Group for the rate increase.

52.     Specifically, Plaintiffs are informed and believe, and on that basis allege, that AXA identified the Discriminated Group as consisting largely of investor policyholders that

acquired their AUL II Policies in or through the secondary market for life insurance.  Such policyholders, like Plaintiffs, have generally paid only enough premiums to cover their monthly policy charges and chosen not to invest in the AUL II policy account, which has resulted in less premium revenue for AXA and lower policy account values.  The Plaintiff Policies, however, do not permit AXA to raise cost of insurance rates based on policy account values or how much policyholders choose to fund their policies.  Indeed, by penalizing policyholders for exercising their contractual right to fund their policies as they choose, AXA has committed not only a breach of the express terms of the Plaintiff Policies, but also a breach of the implied covenant of good faith and fair dealing.

D.    The Rate Increase Is Not Justified by Changes in Reasonable Assumptions as to Mortality and Investment Income

53.    The Plaintiff Policies state that AXA may base a change in cost of insurance rates only on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses.  These are the only six assumptions that AXA may consider, and its assumptions must be reasonable.  Furthermore, to be based on AXA's reasonable assumptions, the changes in cost of insurance rates must correspond with the magnitude of the changes in AXA's assumptions.

54.    Here, AXA has cited only two assumptions in support of the rate increase— mortality and investment income.  Neither of these assumptions, however, supports AXA's rate increase.

**Mortality**

55.    *First*, as to mortality, it is well known in the life insurance industry that over the past decade, mortality has improved, not worsened, and people are living much longer than anticipated several years ago when AXA priced the AUL II Policies.  For example, in 2015, the National Center for Health Statistics reported "[s]ignificant decreases in mortality in 2014 compared with 2013" and observed that this year-to-year improvement was "consistent with

long-term trends."[14]  "Although year-to-year changes are usually relatively small," explained the National Center for Health Statistics, "the age-adjusted death rate in the United States decreased 16.6% between 2000 (869.0) and 2014 (724.6)."[15]  This "long-term trend" of improving mortality is also evidenced by the release of several new mortality tables over the past two decades that would, if anything, support a decrease in cost of insurance rates, not an increase in rates as high as 68%.

56.     Specifically, in 2001, the Society of Actuaries ("SOA") and the American Academy of Actuaries ("AAA") produced the 2001 Commissioner's Standard Ordinary ("CSO") Table, which replaced the previous 1980 CSO Table to reflect significant improving mortality, especially at older ages.  The maximum cost of insurance rates allowed under the AUL II Policies, however, are based on the older 1980 CSO Table, not the newer 2001 CSO Table.[16] The SOA also is currently investigating an update of the 2001 CSO Table, and a 2015 investigative report by the SOA showed significant reductions in insurance company reserves compared to the 2001 CSO Table due to mortality improvements since 2001.  In addition, in 2008, just four years after AXA priced the AUL II Policies, the SOA released a 2008 Valuation Basic Table ("VBT") that reflected significant mortality improvements compared to prior tables, especially at older ages.  In 2014, the SOA released the 2014 VBT, which showed overall mortality improvement from the 2008 VBT.

57.     These new mortality tables demonstrate that since AXA originally priced the AUL II Policies (in or around 2004), mortality has improved, not worsened, and this change in mortality would support a ***decrease***, not increase, in cost of insurance rates.

58.     Plaintiffs also are informed and believe, and on that basis allege, that AXA adjusted the cost of insurance rates for universal life insurance at least five times between 2004 and 2013, updating its mortality assumptions as needed, and AXA never disclosed that it had

---

[14] Murphy, *supra* note 1, at 5.
[15] *Id.*
[16] AXA has defended its COI rate increase by claiming that the new rates remain lower than the maximum rates under the policies.  Those maximum rates, however, are based on the outdated 1980 CSO table and therefore say nothing about whether AXA's new rates are justified in light of its actual mortality experience.

suffered adverse mortality to justify a change in cost of insurance rates on its in-force AUL II Policies.  Indeed, upon information and belief, as late as February 25, 2015, AXA represented to NYDFS that its current experience for factors underlying any nonguaranteed elements, including mortality, was not different from its anticipated experience.  Yet just seven months later, AXA purported to have discovered adverse mortality experience justifying a cost of insurance rate increase of as much as 68%.  It is simply implausible that in just seven months, AXA went from anticipating no changes in mortality to mortality changes justifying a 68% increase in the cost of insurance rates.

### Investment Income

59.    **Second**, as to investment income, upon information and belief, AXA likewise represented to NYDFS as late as February 25, 2015 that its current experience for factors underlying any nonguaranteed elements, including investment income, was not different from its anticipated experience, and it is highly implausible that AXA only discovered an adverse change in investment income justifying a rate increase of as much as 68% just seven months later when it notified the Discriminated Group it was raising their cost of insurance rates.

60.    In any event, even if lower interest rates may impact AXA's cost of providing insurance, they would not justify a rate increase as high as 68% because interest rates should be a relatively minor factor in calculating AXA's cost of insurance (and, consequently, its cost of insurance rates).

61.    To begin with, as it relates to cost of insurance rates, "investment income" can only refer to the investment income that AXA earns (or expects to earn) on its profits from providing insurance, and not on funds in its policyholders' accounts.  As mentioned above, a universal life insurance policy consists of two distinct components—(a) the life insurance, or "mortality," component; and (b) the accumulated value, or "savings," component.  Although a life insurance company may earn investment income from both of these components, it can only consider investment income on the mortality component when determining the ***cost of insurance***.  The investment income it earns from investing funds in policyholder accounts (*i.e.*,

the savings component), on the other hand, is only relevant to setting the ***interest rate*** credited to those accounts, and is not relevant to determining the cost of insurance.  This is because the cost of insurance charge is the mortality charge.  It is intended to cover the risk of the insured's death, not the investment income risk associated with policyholder accounts (and guaranteeing policyholders a minimum interest rate on their policy accounts).

62.     The cost of insurance charge includes an expected profit over the insurance company's expected mortality.  The insurance company then expects to invest this profit and earn investment income on it.  The company then factors this profit and the investment on this profit in setting the cost of insurance rates.  Lower interest rates may result in lower investment income, but lower rates would not result in a loss unless the insurance company's investments had a negative return.  But this is highly unlikely to occur because most life insurance companies invest primarily in fixed-income securities, such as bonds.  Thus, to the extent AXA is raising COI rates because it is earning less investment income on its mortality profits as a result of low interest rates, it is highly unlikely that this lower investment income would justify a rate increase, much less one as high as 68%.

63.     To illustrate this, assume AXA's COI rate contemplated a 20% mortality profit.  For every $120 in COI charges received in a year, AXA would expect to pay out $100 in claims, leaving $20 to invest.  If it assumed it would earn 5% on the profit of $20 in that year, it would expect to earn $1.00 of investment income.  If it now expects to earn 1% instead of 5%, the investment income would drop to $0.20 instead of $1.00.  But this 80% drop in investment income would not translate to an 80% COI rate increase because it does not capture the $20 mortality profit.  In other words, AXA is earning $20.20 instead of $21.00 on the mortality component, which is a difference of less than 4%, assuming mortality is as expected.  If AXA experienced favorable mortality, that favorable mortality experience should also offset the cost associated with the lower than expected investment income.  Although this is a very rudimentary example, it illustrates how a decline in interest rates is not likely to result in a COI rate increase as high as 68%.

64.     As to the investment income on the savings component of a universal life insurance policy, a life insurance company expects to earn a spread on the funds that policyholders maintain in their policy accounts.  That is, if the life insurance company is earning 8% on its investments on policyholder accounts, it may credit policyholders 7% and earn a spread of 1%.  If interest rates are low and the company is earning only 5% on its investment on policyholder accounts, it may lower the crediting rate to 4% and still earn a 1% spread.  Thus, even if AXA could consider interest rates on the policy account values (which it cannot), this would not justify a COI rate increase, but only a change in the crediting rate.

65.     However, if AXA expects to earn only 3% on its investments, AXA cannot reduce the crediting rate to 2% because this rate would be below the guaranteed minimum crediting rate.  Nor, however, can AXA attempt to offset this loss by raising COI rates.  If it could, the cost of insurance would not be a mortality charge, but a way for AXA to guarantee its profitability on the AUL II Policies by transferring to policyholders all risk under the policies, including the crediting rate risk on policy account values.  This would render the guaranteed minimum crediting rate meaningless.

66.     Furthermore, even if AXA is properly considering only investment income on mortality, to the extent AXA is raising COI rates to achieve its original profit expectations, the rate increase is improper because AXA cannot raise COI rates simply to guarantee itself its original profit expectations.  As NYDFS has said, life insurance companies do not have free reign to raise COI rates "simply to boost profits" because profit margin is not an experience factor.[17]  Moreover, as discussed above, the impact of lower interest rates can and must be distributed *equitably* among all policyholders and should not be borne by only the Discriminated Group.

67.     In light of this, and given the magnitude of AXA's rate increase, Plaintiffs are informed and believe, and on that basis allege, that AXA did not base its rate increase on permissible factors, but on impermissible factors such as how much policyholders have chosen to

---

[17] Press Release, NYDFS, *supra* note 2.

fund their policies and AXA's expected investment income on policy account values.  Plaintiffs also are informed and believe, and on that basis allege, that AXA has imposed the rate increase, not because its mortality and investment income experience has been unfavorable enough to require a COI rate increase, but solely to boost its profits.  Profit is not a factor that AXA can consider in changing COI rates.  Furthermore, using COI rates to guarantee AXA's original profitability assumptions, and thereby placing its interest in maximizing gains over the rights of policyholders, would constitute a breach of the implied covenant of good faith and fair dealing.

68.     In sum, by drastically raising cost of insurance rates only on the Discriminated Group, AXA seeks to force Plaintiffs and other members of the Discriminated Group either to (a) pay exorbitant premiums that AXA knows would no longer justify the ultimate death benefits or (b) lapse or surrender their policies, thereby forfeiting the premiums they have paid over the last decades.  AXA, in turn, will make a huge profit—either through higher premium payments or by eliminating a large group of policies (through lapses or surrenders) and keeping the premiums that have been paid to date.  Indeed, as noted above, AXA realized an increase of $46 million to net earnings in just the first nine months of 2015 alone.

E.     The Rate Increase Is an Impermissible Attempt to Circumvent the Guaranteed Minimum Crediting Rate

69.     As explained above, under the express terms of the AUL II Policies, a policyholder has the right to pay just enough premiums to cover the monthly policy charges.  If the policyholder contributes more than needed to cover the monthly charges, leaving a balance remaining in the policy account, the AUL II Policies provide that the balance will accrue interest at a rate no lower than the guaranteed minimum crediting rate.  *See* EFG Doe Policy, Ex. 2, at 1; EAA Doe Policy, Ex. 4, at 1.  The guaranteed minimum crediting rate provided for under the Plaintiff Policies is 3%.

70.     Not only do the AUL II Policies state that the crediting rate will never be lower than the guaranteed minimum, the policy cost factors section also specifically states that any change in any policy cost factors, which includes cost of insurance rates, "will never result in an

interest crediting rate that is lower than that guaranteed in the polic[ies.]"  EFG Doe Policy, Ex. 2, at 11; EAA Doe Policy, Ex. 4, at 11.

71.     AXA admits that it based its rate increase on less favorable investment income expectations.  To the extent AXA considered investment income it earns on funds in policyholder accounts, the rate increase also violates the AUL II Policies' provision that any change in COI rates will never result in an interest crediting rate that is lower than that guaranteed in the policies.  This is evident because if AXA's investment income earned on funds in policyholder accounts did not drop near or below the guaranteed minimum crediting rate, AXA could simply address the change in interest rates by lowering the crediting rate on policy accounts.  But if AXA is raising COI rates instead of lowering the crediting rate, this presumably is because lowering the crediting rate would not be sufficient for AXA—because it is earning investment income near or below the guaranteed minimum crediting rate (thus, reducing its originally anticipated spread).  By raising COI rates to account for this, however, AXA is trying to do indirectly what it cannot do directly: it is using COI rates to achieve a crediting rate that is lower than the guaranteed minimum crediting rate, which is precisely what the AUL II Policies prohibit when they say that any change in policy cost factors "will never result in an interest crediting rate that is lower than that guaranteed" in the policies.

72.     In short, AXA is trying to take the "guarantee" out of the guaranteed minimum crediting rate.  By depriving policyholders of the right to the guaranteed minimum crediting rate, AXA has breached not just the express terms of the AUL II Policies, but also the implied covenant of good faith and fair dealing.

## COUNT I

### (Breach of Contract – Express)

73.     Plaintiffs reallege the allegations contained in paragraphs 1 through 72 inclusive, as if set forth fully herein.

74.     The Plaintiff Policies are binding and enforceable contracts.

75.     Defendant materially breached the Plaintiff Policies in several respects, including

but not limited to the following:

        a.      By increasing the cost of insurance rates on a basis that is not equitable to all policyholders in a given class and instead specifically targeting the Discriminated Group;

        b.      By increasing the cost of insurance rates on a basis other than "reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses";

        c.      By increasing the cost of insurance rates in an attempt to circumvent the guaranteed minimum crediting rates under the AUL II Policies; and

        d.      By imposing excessive cost of insurance rates.

76.      Plaintiffs have performed all of their obligations under the Plaintiff Policies, except to the extent that their obligations have been excused by Defendant's conduct as alleged herein.

77.      As a direct and proximate cause of Defendant's material breaches of the Plaintiff Policies, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial, but in any event that exceeds $75,000, exclusive of interest.

## COUNT II

**(Implied Covenant of Good Faith and Fair Dealing – Contractual Breach)**

**(Policies issued in AL, AZ, CA, DE, FL, GA, MN, NJ, NY, OR, and VT)**

78.      Plaintiffs reallege the allegations contained in paragraphs 1 through 72, inclusive, as if set forth fully herein.

79.      The Plaintiff Policies are binding and enforceable contracts.

80.      The Plaintiff Policies include an implied covenant, actionable in contract, that Defendant will act in good faith and deal fairly with Plaintiffs.

81.      Defendant materially breached the Plaintiff Policies in several respects, including but not limited to the following:

        a.      By charging excessive cost of insurance rates, thereby denying Plaintiffs the benefit of their actual policy account values;

b.      By increasing the cost of insurance rates on policyholders who exercised their contractual right to pay only enough premiums to cover a policy's monthly charges and, in effect, penalizing policyholders for and deterring policyholders from exercising their contractual rights, thereby frustrating their right to one of the essential benefits of their policies;

c.      By targeting Plaintiffs and the Discriminated Group for the cost of insurance rate increase when there is no reasonable actuarial basis for doing so;

d.      By considering investment income that it earns on policyholder accounts, as opposed to investment income only from its mortality profits, in raising cost of insurance rates;

e.      By increasing COI rates in an attempt to restore AXA's original expected profitability for the AUL II Policies at the policyholders' expense;

f.      By increasing COI rates in order to circumvent the minimum guaranteed crediting rate under the AUL II Policies;

g.      By attempting to force Plaintiffs and other members of the Discriminated Group either to (a) pay exorbitant premiums that AXA knows would no longer justify the ultimate death benefits or (b) lapse or surrender their policies, thereby forfeiting the premiums they have paid to date; and

h.      By failing to provide meaningful disclosures about the cost of insurance rate increases, including refusing to provide or make available the documents that Defendant contends support its alleged bases for raising the cost of insurance rates.

82.     Plaintiffs have performed all of their obligations under the Plaintiff Policies, except to the extent that their obligations have been excused by Defendant's conduct as alleged herein.

83.     Defendant's breaches were conscious and deliberate acts, which were designed to and which did unfairly frustrate the agreed common purposes of the Plaintiff Policies and which disappointed Plaintiffs' reasonable expectations by denying Plaintiffs the benefits of the Plaintiff Policies.

84.     As a direct and proximate cause of Defendant's breaches of the implied covenant of good faith and fair dealing, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial, but in any event that exceeds $75,000, exclusive of interest.  Furthermore, AXA's conduct was conscious and deliberate, and constitutes oppression, fraud, or malice, justifying an award of punitive damages.

### COUNT III

**(Implied Covenant of Good Faith and Fair Dealing –Tortious Breach)**

**(Policies issued in CA)**

85.     Plaintiffs reallege the allegations contained in paragraphs 1 through 72, inclusive, as if set forth fully herein.

86.     The Plaintiff Policies are binding and enforceable contracts.

87.     The Plaintiff Policies include an implied covenant, actionable in tort, that Defendant will act in good faith and deal fairly with Plaintiffs.

88.     Defendant materially breached the Plaintiff Policies in several respects, including but not limited to the following:

a.     By charging excessive cost of insurance rates, thereby denying Plaintiffs the benefit of their actual policy account values;

b.     By increasing the cost of insurance rates on policyholders who exercised their contractual right to pay only enough premiums to cover a policy's monthly charges and, in effect, penalizing policyholders for and deterring policyholders from exercising their contractual rights, thereby frustrating their right to one of the essential benefits of their policies;

c.     By targeting Plaintiffs and the Discriminated Group for the cost of insurance rate increase when there is no reasonable actuarial basis for doing so;

d.     By considering investment income that it earns on policyholder accounts, as opposed to investment income only from its mortality profits, in raising cost of insurance rates;

e.     By increasing COI rates in an attempt to restore AXA's original expected

profitability for the AUL II Policies at the policyholders' expense;

   f. By increasing COI rates in order to circumvent the minimum guaranteed crediting rate under the AUL II Policies;

   g. By attempting to force Plaintiffs and other members of the Discriminated Group either to (a) pay exorbitant premiums that AXA knows would no longer justify the ultimate death benefits or (b) lapse or surrender their policies, thereby forfeiting the premiums they have paid to date; and

   h. By failing to provide meaningful disclosures about the cost of insurance rate increases, including refusing to provide or make available the documents that Defendant contends support its alleged bases for raising the cost of insurance rates.

   89. Plaintiffs have performed all of their obligations under the Plaintiff Policies, except to the extent that their obligations have been excused by Defendant's conduct as alleged herein.

   90. Defendant's breaches were conscious and deliberate acts, which were designed to and which did unfairly frustrate the agreed common purposes of the Plaintiff Policies and which disappointed Plaintiffs' reasonable expectations by denying Plaintiffs the benefits of the Plaintiff Policies.

   91. As a direct and proximate cause of Defendant's breaches of the implied covenant of good faith and fair dealing, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial, but in any event that exceeds $75,000, exclusive of interest.  Furthermore, AXA's conduct was conscious and deliberate, and constitutes oppression, fraud, or malice, justifying an award of punitive damages.

## **COUNT IV**

### **(Declaratory Relief)**

   92. Plaintiffs reallege the allegations contained in paragraphs 1 through 72, inclusive, as if set forth fully herein.

   93. For reasons including, but not limited to, those stated herein, there exists an actual

dispute and controversy between Plaintiffs and Defendant concerning Plaintiffs' rights and Defendant's obligations under the Plaintiff Policies, including but not limited to how Defendant must implement any change in the cost of insurance rates and under what circumstances Defendant may change the cost of insurance rates.

94. Accordingly, Plaintiffs seek a declaration (a) that Defendant's cost of insurance rate increase is improper under the Plaintiff Policies and that the policies' account values be recalculated according to the original cost of insurance rates; (b) that Defendant's purported "class" of policies defined by issue age and face amount is an improper class; and (c) setting forth the specific guidelines that govern the factual circumstances under which Defendant can raise the cost of insurance rates.

95. Such a declaration will help prevent or limit any future controversies under the Plaintiff Policies by providing guidance as to when and how Defendant can change the cost of insurance rates on its in-force AUL II Policies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

### On the First Cause of Action

1. For compensatory damages in an amount to be determined at trial;

2. For an award of pre-judgment and post-judgment interest;

3. For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

4. For such other and further relief as the Court may deem proper.

### On the Second Cause of Action

1. For compensatory damages in an amount to be determined at trial;

2. For punitive damages in an amount to be determined at trial;

3. For an award of pre-judgment and post-judgment interest;

4. For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

5.      For such other and further relief as the Court may deem proper.

**On the Third Cause of Action**

1.      For compensatory damages in an amount to be determined at trial;

2.      For punitive damages in an amount to be determined at trial;

3.      For an award of pre-judgment and post-judgment interest;

4.      For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

5.      For such other and further relief as the Court may deem proper.

**On the Fourth Cause of Action**

1.      For a declaration (a) that Defendant's cost of insurance rate increase is improper under the Plaintiff Policies and that the policies' account values be recalculated according to the original cost of insurance rates; (b) that Defendant's purported "class" of policies defined by issue age and face amount is an improper class; and (c) setting forth the specific guidelines that govern the factual circumstances under which Defendant can raise the cost of insurance rates;

2.      For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

3.      For such other and further relief as the Court may deem proper.

Dated: July 12, 2017

Respectfully submitted,

Orrick, Herrington & Sutcliffe LLP


By:/s/ Khai LeQuang
    Khai LeQuang
    klequang@orrick.com
    Abigail W. Lloyd
    alloyd@orrick.com
    Geoffrey Moss
    gmoss@orrick.com
    2050 Main Street
    Suite 1100
    Irvine, CA  92614-8255
    Tel: (949) 567-6700

    Peter A. Bicks
    51 W. 52nd Street
    New York, New York  10019-6142
    Tel: (212) 506-5000

    *Attorneys for Plaintiffs*

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure.

Dated: July 12, 2017

                        Respectfully submitted,

                        Orrick, Herrington & Sutcliffe LLP


By:/s/ Khai LeQuang
    Khai LeQuang
    klequang@orrick.com
    Abigail W. Lloyd
    alloyd@orrick.com
    Geoffrey Moss
    gmoss@orrick.com

    2050 Main Street
    Suite 1100
    Irvine, CA  92614-8255
    Tel: (949) 567-6700

    Peter A. Bicks
    51 W. 52nd Street
    New York, New York  10019-6142
    Tel: (212) 506-5000

    *Attorneys for Plaintiffs*