# EXHIBIT B

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   EFG BANK, Cayman Branch, et
    al.,
4
                    Plaintiffs,
5
             v.                            17 Civ. 4767 (JMF)
6
    AXA EQUITABLE LIFE INSURANCE
7   COMPANY,
                                           Conference
8                 Defendant.

9   ------------------------------x
                                           New York, N.Y.
10                                         May 8, 2018
                                           3:35 p.m.
11
    Before:
12
                        HON. JESSE M. FURMAN,
13
                                           District Judge
14

15                        APPEARANCES

16  ORRICK HERRINGTON & SUTCLIFFE LLP
         Attorneys for Plaintiffs
17  BY:  KHAI LeQUANG
         DANIEL ROBERTSON
18
    MILBANK TWEED HADLEY & MCCLOY LLP
19       Attorneys for Defendant
    BY:  STACEY J. RAPPAPORT
20       ANDREA G. HOOD
         ROBERT C. HORA
21

22

23

24

25
```

1             (Case called)

2             MR. LeQUANG:  Good afternoon, your Honor, Khai LeQuang

3    for the plaintiffs.

4             MR. ROBERTSON:  Good afternoon, your Honor, Daniel

5    Robertson for the plaintiffs.

6             MS. RAPPAPORT:  Good afternoon, your Honor, Stacey

7    Rappaport; Milbank Tweed Hadley & McCoy for defendant AXA

8    Equitable Life Insurance Company.  With me today are my

9    colleagues, Andrea Hood and Robert Hora.

10            THE COURT:  Good afternoon to all of you.  Sorry I'm

11   running a little bit behind.

12            You and your colleagues are certainly keeping me busy.

13            We have a number of things to cover today.  Let me

14   start with the motion for re-reconsideration that was filed I

15   think yesterday or the day before by plaintiffs, or by EFG,

16   with respect to my ruling with respect to the protective order

17   issue.

18            I can only describe the most recent motion as a rather

19   thin motion, but for that reason and others it is denied.  I

20   think EFG falls far short of demonstrating that there is a

21   basis for reconsideration, let alone re-reconsideration, which

22   is what this motion would be.  A description of the new Swiss

23   cases I think AXA describes it as threadbare, and I certainly

24   agree with that.

25            It is a criminal case, not a civil case, but, more

3

1    importantly, given the reasoning of my prior opinion, it's not

2    clear from the threadbare description of the case if the

3    materials at issue were produced with the threat of criminal

4    consequences or procedural consequences.  That was the critical

5    distinction in my prior order.

6            In addition, I cited a decision of the FDJP, stating

7    that Article 271 does not apply to the collection and transfer

8    of one's own information as distinct from transfer of

9    third-party data, and the case at issue in the most recent

10   motion appears to involve the transfer of third-party data

11   rather than, as in this case, EFG's own materials.

12           On top of that, it's unclear to me from the motion

13   whether or to what extent EFG knew or should have known about

14   that other case when it filed either of its first motions.  A

15   letter says that the case was quote/unquote revealed after my

16   last order.

17           The trial began on April 26 and, granted, I don't know

18   a whole lot about Swiss criminal procedure, but I find it a

19   little hard to imagine that it was secret until after my order.

20   Be that as it may, there was obviously some prior notice of the

21   proceedings writ large since there was reference to the

22   Department of Justice Swiss bank program in prior papers and

23   the present motion relies in part on a four-year-old article

24   regarding disclosure of the data at issue.

25           For all of those reasons, the motion falls far short

1    of warranting reconsideration yet again.

2            EFG states in its most recent letter that if I would

3    think that additional briefing is appropriate that it's

4    prepared to do so, but as far as I'm concerned, that's not the

5    way motion practice works.  If you have an argument to make,

6    you make an argument.  You don't make an argument and say, if

7    you don't think that's enough, we are prepared to try again.

8    You've now had, by my count, three times to persuade me, and

9    you have failed to do so, so we are done.

10            Next, there are two April 27 letter motions on the

11   agenda today.  The first is docket No. 143, which AXA moved to

12   compel plaintiffs to produce documents concerning their

13   analyses, valuations, and acquisition of the AULII life

14   insurance policies and to respond to interrogatories concerning

15   the same.

16            I guess I wanted to get a little bit more of a handle

17   on this and, in particular, get AXA's responses to EFG's

18   response, AXA's reply to the opposition.  Namely, I don't quite

19   understand.  It seems to me that the issue in this case

20   concerns the mortality assumptions that went into your pricing

21   at an aggregate level, and in that regard their views and

22   calculations in a particular case of someone's life expectancy

23   don't just seem to go to the heart of anything at issue in this

24   case and in that sense strike me as both irrelevant and that

25   the burdens far outweigh the benefits.  Tell me why that's

wrong.

          MS. RAPPAPORT:  Your Honor, in the first instance,

plaintiffs have not made any particularized burden argument

here.  So AXA disagrees that there has been any showing that

EFG faces any burden or any of the EFG plaintiffs face any

substantial burden that would preclude them from producing the

documents.

          Your Honor, what is at issue in this case are the

reasonableness of the assumptions that AXA used when it

increased cost of insurance in this COI increase that it

implemented in 2016.

          THE COURT:  My understanding is that those assumptions

were based on essentially data, first of all, mortality data,

not life expectancy data, but mortality data, and from

thousands, if not hundreds of thousands of policies at the

aggregate level, not an individual assessment of life

expectancy in any one case.

          MS. RAPPAPORT:  Your Honor, plaintiffs' individual

life expectancy and the reports that show their individual life

expectancies relate to their mortality assumptions.

          If your Honor would permit, I would like to hand up a

document that would show this point very clearly.

          MR. LeQUANG:  Your Honor, if I may address this

document.

          THE COURT:  You will have your chance in a moment.

1           MS. RAPPAPORT:  Your Honor, I just want to note for

2     the record that this document, which is Bates stamped

3     EAA00021910 through EAA00021915, was produced by the plaintiffs

4     in this litigation.  It is marked confidential.

5           I conferred with counsel for the EFG plaintiffs prior

6     to the conference today.  AXA would agree to redact the insured

7     last name on this document and other identifying information on

8     this document because the last name is included elsewhere.  But

9     otherwise takes no position on the confidentiality of this

10    document.  And under the confidentiality order your Honor, I

11    believe we have an agreement as to how this document will be

12    handled in terms of its confidentiality.  But Mr. LeQuang can

13    speak to that later.  We would be happy to address the

14    confidentiality issues and sealing issues in a separate

15    submission, if necessary.

16          THE COURT:  I will table that for a moment.  Tell me

17    what significance this has.

18          MS. RAPPAPORT:  Your Honor, whether this is called a

19    life expectancy report or a mortality analysis is really of no

20    moment.  Plaintiffs do analyze or someone on behalf of the

21    plaintiff have analyzed the life expectancy of this particular

22    individual in this report.  But they have derived, based on

23    that life expectancy, a mortality rate, their own mortality

24    assumptions based on when they believe this individual would

25    perish.

1          The mortality rates that are reflected on this

2   schedule are not something that's been brought out of thin air.

3   These are mortality rates that the entity who did this analysis

4   derived from a mortality table that it was using concerning

5   certain mortality assumptions that it had developed and that

6   plaintiffs may have adopted.  This was something that was in

7   plaintiff's files which presumably they relied upon which they

8   decided to acquire or otherwise invest in these policies, and

9   this document shows that the mortality assumptions that this

10   entity was assuming would exist for this particular policy

11   showed that the policy was significantly underpriced, that is,

12   that AXA's mortality assumptions were significantly different

13   than the mortality assumptions that this entity was presenting

14   here.

15          The reason why that's important, your Honor, is

16   because plaintiffs are contending that AXA's mortality

17   assumptions were not reasonable.  If AXA's mortality

18   assumptions were not reasonable, we are entitled to show what

19   plaintiffs' mortality assumptions about these very policies

20   were and to explore what mortality tables plaintiffs were

21   relying on, which is something that can be derived from this

22   document and other documents that may support this particular

23   document.

24          Whether this is called a particular life expectancy

25   report or a mortality analysis, AXA is entitled to say, our

1    mortality assumptions for an individual of this category,

2    however this person was categorized, whether it's an

3    82-year-old who met certain underwriting standards, AXA is

4    entitled to look at that particular categorization, look at how

5    AXA recognized that individual, what mortality assumptions

6    applied to that category of individuals and see what mortality

7    assumptions plaintiffs were applying to that individual.

8    Whether AXA was using plaintiffs' mortality assumptions is not

9    the issue on this motion.  The issue is a comparison between

10   the mortality assumptions that plaintiffs were using and the

11   mortality assumptions that AXA was using.

12             THE COURT:  Maybe I'm missing something, which is

13   certainly possible and part of the reason that a conference

14   might be helpful here.  The way I understood what you just

15   described is essentially that this document would reveal the

16   application of their mortality assumptions to a particular

17   human being, and that by looking at this you could essentially

18   extrapolate backwards to figure out what those assumptions

19   were.

20             Can't you skip the extrapolation part?  And I think

21   that they are not disagreeing that you are entitled to whatever

22   documents, materials, and information they have concerning

23   their actual mortality assumptions, including whatever tables

24   they are using, whatever illustrations they are relying on,

25   whatever documents they have in their possession concerning

1   whatever mortality assumptions that they are using.  I

2   certainly agree that that would be relevant and go to the heart

3   of what you are describing and the reasonableness of your own

4   assumptions, but what I'm missing is how the application of

5   those assumptions to a particular person, which is what this

6   document seems to reveal, has any bearing on the argument that

7   you are trying to make.

8              MS. RAPPAPORT:  Your Honor, it is not at all clear

9   what mortality table when plaintiffs said they are intending to

10  produce to us a mortality table.  Life settlement investors

11  like plaintiffs in the industry and insurers rely on

12  industry-based mortality tables and then apply their own sets

13  of factors to those mortality tables to determine a mortality

14  assumption.  If plaintiffs were just going to give us an

15  industry standard mortality table and say, this is what we

16  based our mortality assumptions on, that doesn't really help us

17  much because we don't understand what other factors they apply

18  to it.  They have gotten information about AXA's mortality

19  improvement factors, other multiples in what are called scalers

20  that are applied to the mortality table to come up with what

21  the actual assumption is.  And this document, the more detailed

22  information in here would reveal some of that information,

23  whereas a plain vanilla industry mortality table would not, so

24  that is why these types of analyses are important.

25              THE COURT:  Would it not then make sense for you to

1   wait and see what they provide you in terms of the underlying

2   or overall assumptions are, including whatever tables they are

3   using, whatever tweaks they are using to make it to the

4   industry standards and tables or whatever before you determine

5   whether you need to get into the policy-level assumptions and

6   calculations?

7          MS. RAPPAPORT:  Your Honor, we have been waiting for a

8   very long time, but I am not sure that the mortality

9   assumptions and tables would be enough.  Again, we want to see

10  how they were categorizing this particular individual and what

11  mortality rates that they were applying to an individual, and

12  from there we can develop our own analyses about what they were

13  doing across the whole portfolio.

14         We have been waiting for a very long time for

15  documents from EFG.  Their responses to us have not been, A,

16  forthcoming or, B, very revealing about what types of specific

17  information they are going to give us, and we are entitled to

18  see, in our opinion, the mortality analyses that they did when

19  they determined to acquire the policies.

20         I think another important point, your Honor, that this

21  particular document drives home for us is the view that they

22  knew that this policy was underpriced, that the mortality

23  assumptions that AXA was applying were different from the ones

24  that they would apply, that the mortality assumptions that they

25  would apply were significantly worse than the ones that AXA

1    would apply, and that's something that we believe we are

2    entitled to show.

3         THE COURT:  Last question.  To the extent that burden

4    is a factor here, could you not get what you need with some

5    sampling of the individual policies, that is to say, five or 10

6    as opposed to all 106 or so that are at issue here?

7         MS. RAPPAPORT:  Again, your Honor, it would depend on

8    what the underlying data is that EFG is prepared to provide.

9    If we had every single mortality table with every single factor

10   that they applied and every single multiple that they were

11   applying to that mortality table, I might be able to come to

12   some agreement to some more limited set of data.  But right now

13   if all we are going to get is a standard industry table, that

14   would not be sufficient.

15        THE COURT:  Why is it that you don't have that larger

16   set of materials already?

17        MS. RAPPAPORT:  I think that's a question for Mr.

18   LeQuang.  So far we have received no documents from

19   Switzerland, despite your Honor's order.  The substantial

20   completion deadline is coming up on May 25.  We have received

21   no e-mails that's the subject of our other motion, and there

22   has just been a very slow trickle of documents and they have

23   agreed only to produce only a very limited set of documents,

24   your Honor, documents, frankly, that are not really the kind of

25   documents that are essential to our defense of this case.  For

1    example, they have agreed to give us documents that AXA

2    provided to them, policy files, their premium showing that they

3    paid their premiums.  While we want those documents and we

4    appreciate they are agreeing to give those to us, they have not

5    given us the real mortality data that we are looking for and

6    that we need in order to defend against their claims that our

7    assumptions that were applied to the COI increase were

8    unreasonable.

9         THE COURT:  Mr. LeQuang, first, let me take care of an

10   easy matter.  Any objection to this document being docketed,

11   assuming that the personal identifying information is redacted?

12        MR. LeQUANG:  With the redaction we are fine with

13   that, your Honor.

14        THE COURT:  Would you prefer to do the redaction?

15        MR. LeQUANG:  Yes.  We will take a look.  One of the

16   issues I think is just whether only the identifying information

17   should be redacted.  We will review it and determine whether

18   anything else should be redacted.

19        THE COURT:  Why don't the two sides just confer on

20   that and within the next two days hopefully agree upon as

21   minimal redactions as necessary to ensure the privacy of the

22   person there and docket that.

23        I think you would be on firmer ground in making the

24   arguments you are making if you had already turned over all of

25   the sort of general materials and information concerning the

1   mortality assumptions that you were using to make the

2   individual life expectancy calculations.  But, number one, it

3   sounds like you haven't done that.  Why shouldn't I give them

4   all this?  To the extent that you haven't done it, when do you

5   plan to make production of those materials?

6          MR. LeQUANG:  The first thing I want to say, I don't

7   think that's an accurate description of where we stand in the

8   production.  There are two plaintiff groups within the EFG

9   group of cases.  One is EFG, the bank, with Wells Fargo as

10  securities intermediary.  That represents the EFG ownership

11  group.

12          In addition, there are several trust entities that own

13  policies and that represents an entirely different ownership

14  group, which is EAA, which stands for Erste Abwicklungsanstalt.

15          Erste Abwicklungsanstalt, or EAA, is a governmental

16  agency, German governmental agency, that was formed to wind up

17  the assets of a German bank called WestLB or Portigon.  EAA has

18  virtually completed its production of all of its documents.

19  There were meet and confer discussions regarding new custodians

20  and EAA is in the process of collecting and producing those

21  documents, but the suggestion that EAA has somehow has not

22  produced documents or not completed its production of documents

23  in a prompt manner is entirely erroneous.  The production of

24  those documents would include anything of the ilk that

25  Ms. Rappaport had just described, including any mortality

1    assumptions or scalers or anything of that kind.

2          This motion under the issue before us today is with

3    regard to individual policy valuations and individual life

4    expectancies.  Those are what we objected to producing, and we

5    specifically, in accordance with the rules, identified that as

6    a category of documents we would not be producing in our first

7    objections in responses to their requests for production months

8    ago.

9          We reached an impasse based on this discussion and

10   meet and confer long ago in this.  I'm happy to discuss it, but

11   the suggestion that we have not produced those documents that

12   are otherwise are more broadly relevant, I don't think that is

13   accurate.

14         EFG, that group, as your Honor knows, has not produced

15   documents from Switzerland.  I don't know what is included

16   within those.  But I also think Ms. Rappaport is just

17   speculating that there are things like mortality assumptions or

18   anything of that kind regardless.

19         The history here is that we are policyholders.  We are

20   not insurance companies.  The type of document you are seeing

21   here is not an insurance company document.  It's not mortality

22   assumptions.  In fact, if we waited until there was some

23   additional discovery to talk about the nature of the interests

24   of both EAA and EFG, AXA would learn, for example, that EFG --

25   or let's take EAA.  EAA inherited the assets of WestLB or

1    Portigon.  Portigon owned a security interest in these policies

2    by making loans to other companies that themselves acquired the

3    policies.

4              What you see when you see these valuations and a lot

5    of documents like this are going to be loan administration

6    documents, internal loan administration documents of a bank.

7    And all they are doing is tracking the payments of the borrower

8    that will need to be made or the value of their collateral to

9    determine whether there is a default under the loan provisions.

10   These things don't have to do with AXA's mortality assumptions.

11             In fact, this document here is dated June 2009, six

12   years before AXA raised COI rates.  Ms. Rappaport made a number

13   of comments about what this reveals and I don't know where she

14   gets that at all, including that the AXA policies are

15   underpriced, because AXA's policies are priced at a certain

16   level, but they have assumptions about premium payments that

17   are more than just the cost of insurance charges.

18             So you can't tell anything from here other than the

19   fact that in 2009, somebody on behalf of the policyholder's

20   side expected to pay a certain amount of premiums over a

21   particular period of time, and that particular period of time

22   was determined by obtaining medical records from these insureds

23   who authorized them to obtain these medical records and allowed

24   them to come up with life expectancy estimates and, therefore,

25   a cash flow estimate or a cash projection of how long they

1    would have to pay these premiums.

2          They don't bear on the reasonableness of AXA's

3    mortality assumptions.  In fact, it is the current assumptions

4    that are at issue, not the prior assumptions.  You can look at

5    that what their original assumptions are.  But as the documents

6    that we submitted show, AXA's own mortality analysis, what they

7    did was they looked at the deaths, how many people died over

8    the span of a number of years and whether that was more than

9    what they had expected.

10          When we challenge the reasonableness of that, we will

11    be challenging whether they actually had a basis in looking at

12    the number of deaths under the AULII group of policies for

13    raising rates or claiming to have suffered adverse mortality.

14    The fact that some individual has 84 months to live or 64

15    months to live when they are in 2009 and 74 years old is not

16    going to bear upon that.

17          If there is a mortality assumption document, something

18    out there that describes how we came up with certain

19    assumptions, we are producing those documents.  But here I will

20    also say that when we talk about the history for EFG and EAA,

21    these policies go back to I think 2004.  You will have, I would

22    guess, thousands of these types of reports, tons of e-mails we

23    have done, and these are in the meet-and-confer letters that

24    were submitted with the motion, just hit checks.  So terms like

25    LE, which would capture these life expectancies, I think we

1    indicated had somewhere around tens of thousands of hits and

2    cover this 10-year-period of time where the role is simply a

3    lender trying to keep track of its security interest.  Are they

4    relevant?  I don't think so.  Have they shown that they are

5    relevant?  No.  Have we refused to produce the things that are

6    relevant?  No.

7           The only outstanding issue here really are the EFG

8    plaintiff documents.  I'm mindful of the Court's ruling with

9    regard to the Hague convention.  EFG will have to decide what

10   it needs to do with regard to that issue.

11          THE COURT:  On that issue, brief digression, has EFG

12   collected those documents in Switzerland?

13          MR. LeQUANG:  There was a first wave of documents.

14   Those are all collected and ready for production.  There were

15   subsequent meet-and-confer discussions in which we agreed to

16   collect from additional custodians and that collection and

17   review is still in process, but it could be ready within weeks

18   or something.  It's hard for me to estimate at this point.

19   Certainly by custodians or by the review we could, in theory,

20   roll out productions.  The issue is what will EFG do in light

21   of its concerns.

22          THE COURT:  You better decide that sooner rather than

23   later.  I'm not staying any deadlines in connection with this

24   matter.  As far as I'm concerned, it's decided and you

25   represented in your motion papers that you were prepared to

1   produce those materials.  It was just a matter of how and when,

2   not whether, and, therefore, you should have undertaken

3   whatever efforts were needed to collect them.  I would not

4   expect that collection would cause any sort of delay.

5          MR. LeQUANG:  We have not delayed in any way that

6   process.

7          THE COURT:  Do you dispute the proposition that one

8   could extrapolate from a document of this sort what mortality

9   assumptions are being applied to this particular person?  It

10  sounds like you do.

11         MR. LeQUANG:  I do.  I don't see anything in here that

12  suggests anything of what Ms. Rappaport had described can be

13  gleaned from this particular document.

14         The one issue I did want to raise is, this was just

15  given to me just prior to this hearing that wasn't submitted

16  with the papers.  I glanced at it briefly.  I don't know and

17  haven't had a chance to review it in its entirety, but, again,

18  say that it is representative of the type of documents we

19  intended to exclude for the reasons we have discussed.

20         THE COURT:  What is your response to my thinking out

21  loud that maybe some sort of sampling approach, giving them say

22  five files, if I can call them that, as a way of providing them

23  some means to sort of test their view that you can extrapolate

24  relevant information from these documents?  What is your

25  response to that?

1            MR. LeQUANG:  It does alleviate the significant burden

2       concern.  Because I obviously don't think it's relevant, I do

3       believe we can accommodate that to address this particular

4       issue.  I don't think a document like this shows anything, and

5       one of the burdens that I also would mention, as you can see

6       with this document, I still don't believe that AXA would be

7       entitled to know the life expectancies or medical records or

8       have access to the medical records of these insureds and,

9       hence, we would need to redact any identifying information,

10      even in the production to AXA of documents like this.  I

11      suspect they will still have sufficient identifying information

12      within this document to know that one of the insureds under

13      their policy has a particular life expectancy based on a

14      particular medical record review.

15           THE COURT:  You produced this particular document to

16      them.

17           MR. LeQUANG:  This was produced inadvertently.  It was

18      just brought to my attention and that's why it is being used

19      today.

20           THE COURT:  Here is what I am going to do on this

21      front because I do want to move things along, recognizing that

22      we are already far behind.

23           MS. RAPPAPORT:  Your Honor, may I be heard briefly on

24      a few points that Mr. LeQuang raised?

25           THE COURT:  Very briefly.  We have other ground to

1    cover, and I have other cases awaiting.

2              MS. RAPPAPORT:  Very quickly, your Honor.  The fact

3    that this document was a loan document, which is what's been

4    represented here, that's not relevant.  We are not looking at

5    what the purpose of this was for.  It is a valuation document.

6    It does reflect mortality rates that an entity using an

7    industry type table applying certain factors was using.  That's

8    No. 1.

9              With respect to the fact that the document is dated in

10   2009, plaintiffs have requested AXA's interim mortality

11   assumptions.  They are not limiting themselves to assumptions

12   that we are at pricing or assumptions at the COI increase.

13   Things in between they view as relevant.  Just as they have

14   argued that they are entitled to see how our mortality

15   assumptions have developed, we are entitled to see how the

16   entities that we are valuing their policies also develop their

17   mortality assumptions.

18             Those were the two points I wanted to raise.

19             THE COURT:  For now I am going to deny the defendant's

20   motion on this particular score.  I'm really not persuaded that

21   the policy level documents that we are discussing are going to

22   yield the kind of information that is relevant to the arguments

23   that the defendant wants to make.  I certainly understand that

24   argument.  I just don't necessarily see how the application,

25   unless plaintiffs obtained individual health-related

1    information and on that basis felt that somebody was likely to

2    die sooner or live longer, whatever the case may be, that the

3    mortality assumptions would have it.  I don't see how that

4    necessarily speaks to the reasonableness of the aggregate level

5    mortality assumptions.

6           Having said that, maybe I'm wrong, maybe I don't

7    understand precisely how AXA would extrapolate from this

8    particular document, by way of example, the information that

9    Ms. Rappaport is describing, so here is what I propose.

10          That you confer about this and do so quickly and, in

11   particular, that you confer with respect to my proposal of

12   possibly using some sort of sampling approach where AXA has

13   provided five or 10 sets of policy-related documents on the

14   theory that that would minimize the burdens but provide enough

15   of a window or peek, if you will, into whatever assumptions are

16   being applied to the individual policies at issue if indeed it

17   reveals them at all.

18          If after that meeting and conferring you can't reach

19   agreement, you can revisit this issue with me, in which case I

20   would expect that using this document or otherwise, AXA should

21   actually spell out in some detail how it would read into or

22   read from this document the information that it says it needs,

23   and that is to say, how it would use it and how it does speak

24   to the reasonableness of the overall assumptions that are at

25   issue.  Why don't you do that.  Why don't you meet and confer

1    sooner rather than later and let me know by the end of next

2    week if you have reached agreement on this issue or if there

3    are any issues that remain in dispute, in which case I will

4    either have you back or resolve it at that point.

5           Next is the acquisition documents.  According to the

6    response, docket 146, plaintiffs have agreed to produce "any

7    acquisition documents that bear on this issue, including

8    documents concerning the circumstances under which AXA may or

9    may not change COI rates, the possibility that AXA may or may

10   not change COI rates, the COI provisions of the AULII policies

11   and the COI increase."  I must say, I would be a little bit

12   anxious if I were in plaintiffs' shoes making those judgments

13   and limiting disclosure only to things that meet that

14   definition or those characteristics, but I certainly think that

15   that adequately describes the relevant set of documents at

16   issue, and in that regard I am not inclined to think that the

17   broader set of acquisition-related documents is relevant here.

18   Ms. Rappaport, is there something I'm missing on that score?

19          MS. RAPPAPORT:  Your Honor, first, this implicates the

20   same valuation type issues that AXA believes it's entitled to

21   review documents about how plaintiffs valued the policies when

22   they acquired them, including what mortality assumptions they

23   were applying and what they thought, cost of insurance, the

24   appropriate cost of insurance rate or the cost of insurance

25   rate that they would calculate, based on their mortality

1    assumptions, should be.  For the same reasons that we were just

2    discussing, we believe that those valuation documents are

3    important to AXA's defense.

4           In addition, there is no reason to limit plaintiffs'

5    production to just the possibility of a COI increase or the

6    narrow categories that they have described.  Plaintiff has not

7    articulated why we are not entitled to documents that they have

8    in their possession concerning cost of insurance rates on the

9    AULII policies that they own or they have an interest in, and

10   those are the types of documents that we are looking for.

11          We are not convinced that this narrowing is at all

12   sufficient and, frankly, are concerned about the type of

13   limiting that plaintiffs are trying to do and how they are

14   determining -- or a document showing an expectation of a

15   different COI or what their internal COI rate or mortality rate

16   would be, in our view, is something that bears on COI and goes

17   to the possibility of the COI increase.

18          THE COURT:  I agree.  But maybe that just means that

19   the devil is in the details of how broadly or capriciously one

20   construes the category that I just read and that's from

21   plaintiffs' letter.  I would certainly think that documents

22   relating to COI generally with mortality assumptions with

23   respect to acquisition would fall within that category and be

24   relevant, but I was reading it to include those.  Am I wrong

25   about that?

 1              MS. RAPPAPORT:  Are you asking Mr. LeQuang?

 2              THE COURT:  Yes.

 3              MR. LeQUANG:  I don't think you are wrong.  Again, one

 4    of the things that would be helpful is to explain what we are

 5    talking about here.  And when we say acquisition documents, for

 6    example, as I mentioned before, EAA obtained ownership over the

 7    assets of WestLB through a governmental transfer of assets from

 8    the bank.  There is a ton of agreements and a lot of e-mails

 9    and discussions about that transfer in connection with

10    essentially the wind-up of WestLB.  It has got nothing to do

11    with the reasonableness of AXA's mortality assumptions or COI

12    rates or anything like that.

13              But if there is something in there that says that

14    these policies are subject to these COI increases or anything

15    like that, we are agreeing to produce those documents.

16              THE COURT:  I assume you would also agree anything in

17    there that would relate to either these are the mortality

18    assumptions that AXA is using or these are the mortality

19    assumptions that we would apply or we think that this is

20    underpriced or overpriced, that would also be subject to

21    production.

22              MR. LeQUANG:  Yes.  Our production is based on agreed

23    search terms.  Many of the search terms are centered around

24    things like underpriced, were or mortalities high, or rates or

25    things like that.  Yeah.  We have agreed to produce those

1    documents.

2            This big fight here is because there are going to be

3    thousands of documents about various transactions and

4    acquisition, quote, documents that have no bearing at all on

5    any issue in this case, and we can't just blindly produce all

6    of these acquisition documents.

7            As an example, too, this goes back to one of the

8    original policy ownerships or policy structures.  There were

9    loans made to the original insureds.  There were loan

10   agreements.  The agreements provided that the policies were the

11   security for the loans.  So you have a number of loan

12   transaction documents.  The original lender foreclosed on the

13   policies.  Then a bank that loaned money to that lender ended

14   up foreclosing because that lender defaulted.  None of these

15   things have bearing on this.  Yet, that's what we are fighting

16   about here.

17           On the other hand, if they have to do with COI rate

18   issues, we have agreed to produce them.

19           MS. RAPPAPORT:  Your Honor, the documents valuing the

20   policies for acquisition and diligence for the acquisition

21   absolutely bear on the issues in this case because how the

22   plaintiffs or a third party were valuing those documents in the

23   portfolio necessarily relates to the mortality assumptions that

24   were being applied.  If you are talking about how long a person

25   is going to live based on a set of an industry table and, as I

1   said, those other factors, that insurance companies and life

2   settlement investors apply need to understand what mortality

3   assumptions you're looking at for that particular portfolio

4   policy or that particular policy in order to understand whether

5   it's a worthwhile transaction for you.

6            Documents that were acquired during diligence on those

7   policies or are valuing those policies are absolutely relevant

8   to this case.  And to just brush those aside as, well, they all

9   relate to this one big transaction, we are entitled to

10   documents concerning the AULII portfolio and how those were

11   valued and what mortality assumptions were applied to those

12   policies.

13            THE COURT:  I hear you.

14            I am not persuaded that there is a need for me to

15   grant any relief at this time, which is to say, that I think

16   that it sounds to me like the plaintiffs are striking or

17   drawing the line properly between what is relevant and what is

18   not relevant.  And defendant relies on Judge Francis' decision

19   in the *U.S. Bank* case where he said that he's not willing to

20   take at face value U.S. bank's assertion that it has produced

21   all documents responsive and, therefore, directs them to

22   produce a broader set of documents.  But that's because he

23   found that the line or their application of the line in that

24   case was not proper.

25            If that turns out to be the case here and something is

1    revealed that indicates that there are documents that clearly

2    are relevant that have not been turned over, perhaps I will go

3    that route.  As I said, if I were in plaintiffs' shoes, I might

4    decide on that basis to produce a broader set of documents and

5    not draw the line so strictly, which is another way of saying,

6    you proceed a little bit at your peril.

7           For now, I think you are drawing the line

8    appropriately, subject to the discussion that we had a few

9    minutes ago, which is to say, if you agree, for example, that

10   some subset of individual policy related documents should be

11   produced so that defendant can make the argument, but on the

12   basis of a sampling, presumably, that would extend to the

13   acquisition-related documents concerning those particular

14   policies as well.

15          Let's try to move quickly through the matters raised

16   in the second letter.  This is at docket No. 144.  First, on

17   e-mails and ESI custodians, am I correct that this pertains

18   only to the Wells Fargo e-mails at this juncture?

19          MR. LeQUANG:  If you are asking me, your Honor, the

20   answer is yes, and I don't really think there is an issue.  In

21   fact, after receiving this motion, we called AXA's counsel to

22   make sure they understood, we are producing e-mails from Wells

23   Fargo, and they confirmed that they did understand that.

24          It was actually the filing of this motion that alerted

25   us to the fact that, apparently, e-mails that we thought had

1    been produced had not in fact been produced.  But had they

2    raised that with us, because we actually told them we had

3    produced them, that they had not located any e-mails, we

4    probably wouldn't have a motion.  We would just be dealing with

5    this.  But the separate issue is, those e-mails came out of the

6    system called FileNet, and FileNet is a shared repository.

7         Wells Fargo, as a securities intermediary, has

8    primarily an administrative role here, and I don't want to sum

9    up or categorize all of the duties under the securities account

10   control agreement, but it is, generally speaking,

11   administrative and they send, receive correspondence from the

12   carrier to the entitlement holder, who is EFG.  All of the

13   substantive communications, e-mails, they are put on file now.

14   Wells Fargo doesn't do much else with regard to the policies.

15   As you have in the declarations that we submitted, all these

16   kind of material communications, and they are not very material

17   when we talk about Wells Fargo.  They are on file now.

18        What AXA wants us to do is to go into e-mails of

19   individual custodians, like the ones who upload the files to

20   FileNet, and search their independent e-mail systems for

21   additional e-mails, even though what should be relevant is on

22   file.

23        The Sedona Conference principles recognize that when

24   there is an information governance protocol, a protocol for

25   putting systems on for documents for later use, you can rely on

1   that.  Once they actually have a chance to review the documents

2   and actually understand the scope of Wells Fargo's duties as

3   securities intermediary, I think they could come back and raise

4   issues about inadequacy of production, but I doubt that will be

5   an issue.  I will try to keep that simple.

6           THE COURT:  Ms. Rappaport, briefly.

7           MS. RAPPAPORT:  First of all, the Sedona principles

8   case that plaintiffs reference has to do with document

9   preservation, not whether a party has an obligation to search

10  documents outside of that system, and plaintiffs are making

11  these distinctions as what they believe are substantive and

12  important, which is not how discovery works.  They are supposed

13  to be producing documents that are responsive to our discovery

14  requests.

15          THE COURT:  I think Mr. LeQuang's point that anything

16  that has been responsive has been filed in FileNet.

17          MS. RAPPAPORT:  Plaintiffs will not know that because

18  they are refusing to search the files of, at this point, even

19  eight, only eight custodians and their individual e-mail boxes.

20  AXA has searched the files of over 60 custodians in connection

21  with this litigation.  And to request that plaintiff search

22  eight or other custodians that they believe might have

23  responsive documents should not pose a significant burden at

24  all to Wells Fargo.

25          THE COURT:  Are you deposing those eight people?

1              MS. RAPPAPORT:  It's possible that we will, but we

2     need to see what the documents are that are coming from those

3     people, which we have not received yet.  I'm not in a position

4     to fully understand what their roles are other than

5     representations that have been made to us at this point.

6              THE COURT:  I am going to leave it as is for now.  If

7     you depose somebody and determine that there is some basis to

8     believe that they are likely to be relevant in responsive

9     documents that are not filed in FileNet, then I would revisit

10    it, but I am inclined to think that their protocols are

11    sufficient.

12             Next is documents and information that Wells maintains

13    in capacities other than as securities intermediary for EFG.

14    First of all, I take it that there is no longer any dispute

15    concerning Wells' relationship as trustee to the EAA trusts.  I

16    understand that this case is not being brought by Wells as

17    trustee for those trusts, but by the trusts directly in

18    themselves.  Is that correct?

19             MR. LeQUANG:  That is correct, your Honor.

20             THE COURT:  Ms. Rappaport.

21             MS. RAPPAPORT:  Yes, your Honor.  But the Delaware

22    code and the position that Wells Fargo holds under the code,

23    and plaintiffs haven't showed us any documents otherwise, says

24    the statutory trustee has control of the business and affairs

25    of the entity to which it is serving as a trustee.  Just

1    because it has a role as statutory trustee, as opposed to

2    common law trustee, is, to AXA, distinction without a

3    difference for that purpose, and plaintiffs haven't said

4    anything other than, they are not a common law trustee, so,

5    therefore, we don't have to produce their documents.

6              MR. LeQUANG:  Your Honor, if I may.

7              THE COURT:  You may.

8              MR. LeQUANG:  I don't know if this is certainly some

9    confusion.  But the fact the trustee has control is not the

10   issue.  Wells Fargo, as a trustee, is a distinct entity from

11   the trusts, and the trusts don't control everything that Wells

12   Fargo controls.

13             One thing I want to be clear, the trusts have produced

14   documents from Wells Fargo as trustee that the trusts have

15   control over.  But the statutory trusts, those entities don't

16   actually have control over Wells Fargo's internal e-mails.

17             That said, I'm kind of loathe to have much of a debate

18   about this.  If I can confer with Wells Fargo, because I think

19   at bottom all of this is, do they need to serve a subpoena on

20   Wells Fargo as trustee for the trust to get certain other

21   documents.  I'm sure we can forego that with further ado.  I

22   would like to offer that I confer with Wells Fargo and see if

23   we can just agree that the documents will be requests served on

24   us and will be effectively requested of them without requiring

25   a subpoena.

1          THE COURT:  Why don't you do that and update me a week

2     from Friday as well.  The point of the meet-and-confer rules in

3     my rules is make that happen before we are here and save me the

4     time and trouble of both preparing and having to address this

5     in court, but I will take up that invitation and have you do

6     that.

7          With respect to Wells Fargo's status as securities

8     intermediary, does your meet-and-confer offer extend to that as

9     well?

10          MR. LeQUANG:  Well, there is a broader issue on that,

11     which is, I think that AXA would like the documents from Wells

12     Fargo for all relationships that Wells Fargo has.  Wells Fargo

13     can't agree to that.  They have brought this suit as the

14     securities intermediary for EFG on the EFG policies.  But EFG

15     is an entitlement holder under the agreement with Wells Fargo.

16     Wells Fargo is only authorized to bring suit on behalf of EFG.

17     EFG can't authorize a suit on behalf of various other

18     entitlement holders.  And one example of that would be LSH, who

19     subsequently filed suit.  LSH is another entitlement holder

20     where Wells Fargo acts as securities intermediary.  There are

21     at least many others.  I can't recall offhand the number of

22     other entitlement holders.

23          THE COURT:  Fifty-four, I think.

24          MR. LeQUANG:  What AXA wants is that Wells Fargo needs

25     to go into all of their policy files and all of their FileNet

1   systems and pull all their documents.  And that's what Wells

2   Fargo -- I think the main objection to that is relevance, but

3   also I think they have duties under their agreements with them

4   and with those other entitlement holders where they can't just

5   produce their documents.  Our position is, in the first

6   instance, that other entitlement holders' policies are not

7   relevant and Wells Fargo should not have to produce those

8   documents, having brought a claim only as securities

9   intermediary for EFG.

10          THE COURT:  Maybe I don't understand what documents

11  would be in those files.  But what if there are documents that

12  speak to the reasonableness of the mortality assumptions and

13  they just happen to be filed in connection with the different

14  entitlement holder?

15          MR. LeQUANG:  For example, and I think I can

16  represent, although based on what I know today, Wells Fargo

17  would not be evaluating or making any assessments about the

18  reasonableness of anybody's mortality assumptions.  As a

19  securities intermediary it is simply the direct holder for an

20  indirect holder.  But would the assumptions of a third-party

21  entitlement holder not communicated to any of the plaintiffs in

22  this case that lie in their own files be relevant to this case?

23  I would submit not.  Otherwise, I suppose we could all subpoena

24  every insurance company in the industry to get their mortality

25  assumptions and say that they may bear upon the reasonableness

 1  of AXA's mortality assumptions.

 2          THE COURT:  Ms. Rappaport, what do you expect to be in

 3  the documents or files relating to other entitlement holders

 4  that would be relevant here?

 5          MS. RAPPAPORT:  Your Honor, documents concerning AULII

 6  and documents concerning mortality assumptions applicable to

 7  AULLII and documents concerning AULLII cost of insurance.

 8  Plaintiffs here haven't shown us any agreement that would

 9  preclude Wells Fargo from producing documents that are in these

10  files of these quote/unquote other entitlement holders, and

11  there is a confidentiality order in place here which we have

12  been abiding by, and we produced tons of confidential

13  information to the plaintiffs, and we have had to go out and

14  seek relief from other confidentiality agreements that we have

15  in order to comply with requests in this case, and there is no

16  reason that Wells Fargo should not be doing the same.

17          The other issue that's raised, and I think probably

18  relates more to the first motion, your Honor, that we did not

19  address was the issue of EFG standing to even bring this case.

20  It claims it's an entitlement holder and it claims it has a

21  beneficial interest in these policies.  But we have seen

22  nothing from Wells Fargo or EFG to show what policies are

23  covered by the securities account control agreement.

24  Plaintiffs have produced a list, but the list was unaccompanied

25  by any e-mails or attached to any agreement, so we are not even

1    sure what this list purports to be.  But that certainly goes to

2    the standing of EFG to pursue this action and those certainly

3    would be documents that Wells Fargo may have in its files and

4    should be produced.

5         THE COURT:  That is a different matter and I certainly

6    would agree that any documents relating to EFG would presumably

7    be subject to production.  We are getting a little bit ahead of

8    ourselves, but I don't quite understand why documents

9    pertaining to the reasons that Wells Fargo and EFG entered into

10   the agreement, whatever the SACA stands for, securities account

11   control agreement, why that would be relevant.  But the

12   agreement itself and any documents that would verify or

13   underlie what policies are within the scope of that agreement I

14   would certainly agree and think should be produced.

15        MS. RAPPAPORT:  It's my understanding, your Honor,

16   that one of the reasons why institutional investors enter into

17   these securities account control agreements IS to facilitate

18   the sale or transfer of policies.  To the extent that a reason

19   why they entered into this agreement was because they were or

20   believed that COI would increase or that it related somehow to

21   the COI that was on the policies would be relevant to the case.

22   That's why we are seeking documents concerning the reasons

23   why --

24        THE COURT:  You are already getting documents

25   concerning their mortality assumptions and COI and the prospect

1   of COI increases and so forth, so that would fall within the

2   scope of those and you would get them.  Beyond that, I don't

3   see what relevance the reasons that they entered into the

4   securities account control agreement would have.  I don't think

5   you are entitled to that.  But, again, that's separate and

6   apart from whatever documents are needed to prove that EFG

7   actually has standing to bring this.  They should produce

8   those.

9         I don't feel I have much a handle of what these other

10  clients are or what might be in there.  It doesn't sound to me

11  like that they are likely to be relevant or their production

12  would be proportional to the needs of this case, but in the

13  interest of time, I am going to leave it there.  You can always

14  raise that with me again, if you discuss it further and you

15  can't reach some sort of agreement to it, for now I am going to

16  deny the defendant's motion on that front as well.

17        I think that covers everything, subject to the things

18  that you'll be discussing in the next week and a half.  Did I

19  miss something?

20        MR. LeQUANG:  I think you have covered everything.

21        MS. RAPPAPORT:  No, your Honor.

22        THE COURT:  The last thing is the sealing matter,

23  docket No. 159.  I received AXA's letter yesterday.  I do

24  approve sealing and redaction relating to Exhibits B and C, but

25  am I correct that you are not seeking to keep under seal

1    Exhibit A, is that correct?

2              MS. RAPPAPORT:  That's correct, your Honor.

3              THE COURT:  If you could file that within two days as

4    well, along with whatever redacted version of this document

5    that you handed up, that would be great.

6              Anything else?  Very good.

7              I expect I will hear from you again, but, hopefully,

8    you will make some progress.

9              Mr. LeQuang, as I said, make sure you figure out what

10   you are doing on that Switzerland front.  If you are not

11   intending to seek some sort of relief, and I don't think you

12   will get it, you better produce it sooner rather than later.

13   Deadlines are what they are and they are not stayed.

14             MR. LeQUANG:  Judge, I understand the issue.

15             THE COURT:  Thank you very much.

16             (Adjourned)

17

18

19

20

21

22

23

24

25