# EXHIBIT C

i6d2efgC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  EFG BANK AG, CAYMAN BRANCH, et
   al.,
4
                    Plaintiffs,           New York, N.Y.
5
             v.                           17 Civ. 4767(JMF)
6
   AXA EQUITABLE LIFE INSURANCE
7  CO.,

8                   Defendant.

9  ------------------------------x        Conference

10                                        June 13, 2018
                                          2:20 p.m.
11
   Before:
12
                      HON. JESSE M. FURMAN,
13
                                          District Judge
14

15
                          APPEARANCES
16

17 ORRICK, HERRINGTON & SUTCLIFFE, LLP
        Attorneys for Plaintiffs
18 BY:  DARREN S. TESHIMA

19
   SUSMAN GODFREY, LLP (via telephone)
20      Attorneys for Plaintiff Brach Family Foundation
   BY:  ROHIT NATH
21

22 MILBANK TWEED HADLEY & McCLOY LLP
        Attorneys for Defendant
23 BY:  STACEY J. RAPPAPORT
        ANDREA G. HOOD
24

25

i6d2efgC

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your names

3     for the record.

4          MR. TESHIMA:  Good afternoon, your Honor.  Darren

5     Teshima, Orrick, Herrington & Sutcliffe, on behalf plaintiffs

6     EFG Bank and Wells Fargo Bank as securities intermediary.

7          THE COURT:  Good afternoon.

8          MS. RAPPAPORT:  Good afternoon, your Honor.  Stacey

9     Rappaport.  With me is my colleague Andrea Hood, Milbank Tweed,

10    Hadley & McCloy, LLP, for defendant AXA Equitable Insurance

11    Company.

12         THE COURT:  Good afternoon to you, as well.

13         And my understanding is Mr. Nath is on the line as

14    well, is that right?

15         MR. NATH:  Yes, your Honor.  Good afternoon.  Mr. Nath

16    is on the line.

17         THE COURT:  I would remind those in the room to just

18    speak into the microphone.  It is all the more important

19    because Mr. Nath is listening in by telephone.

20         So I must say I'm a little frustrated that you guys

21    are back in need of further assistance.  I had hoped and

22    thought even that I charted a path at the May 8 conference that

23    would allow you to essentially figure out the particulars, that

24    is to say, that would enable AXA to get what it feels it needs

25    to defend this case without imposing an undue burden on the

i6d2efgC

1    plaintiffs, but it seems to me that something went awry and

2    that obviously didn't happen.

3          The problem I have is that I am at a severe

4    disadvantage here.  I was hoping that by articulating the sort

5    of broad principles and making a proposal for how to proceed at

6    the last conference, that you guys would be able to sort of do

7    the dirty work and get into the weeds, whatever metaphor you

8    want to use, and actually figure out what it meant as applied

9    to the particular documents.  The disadvantage I have is that I

10   am not familiar with what those actual documents are, and so,

11   you know, it is hard for me to get into the particulars.  Maybe

12   we need to get even further and you need to submit more

13   particularized descriptions of what we are talking about for me

14   to understand it.  But hopefully we can put an end to all of

15   this today and avoid the need for that.

16         It does seem to me, and I obviously could be wrong

17   about this, it is sometimes hard to tell, but both sides bear

18   some of the blame for the impasse here; but, to be candid, I

19   think much of the blame lies with the plaintiffs here.  It does

20   seem to me from what I have reviewed that their positions have

21   been something of a moving target, that there were

22   representations made to me at the May 8 conference, for

23   instance, with respect to whether they have documents with

24   mortality assumptions and the like that have since been

25   changed.  And it strikes me that some of the production has

i6d2efgC

1   been somewhat slow, most notably with respect to the Swiss

2   documents, that I don't understand why it took -- and I presume

3   that they have now been produced, but why it took until my

4   order setting a deadline for their production for that to

5   occur, given that I had denied the protective order and denied

6   a motion for reconsideration of the protective order.  So it

7   strikes me that plaintiffs were dragging their feet somewhat at

8   least on that front, if not more broadly.

9            It is also not lost on me that these issues don't seem

10   to have presented themselves in the other cases within the AXA

11   litigation.  Maybe there are separate reasons specific to this

12   case that would explain that; but, in any event, it certainly

13   contributes to my sense that there is something going on here.

14            So again, I assume that the Swiss document issues are

15   now moot.  I very much hope that you are not going to tell me

16   otherwise.

17            Proceeding on that assumption, I think there are three

18   other issues that were raised in AXA's most recent letters, two

19   of which I think can sort of go hand in hand.  Before I get

20   into them, is there anything that you were supposed to be

21   continuing your discussions on these issues in light of the

22   adjournment of the conference from last week?  I don't know if

23   you made any progress or if there is anything to update me

24   about, but do you want to start there, Ms. Rappaport?

25            MS. RAPPAPORT:  Yes, your Honor.

i6d2efgC

1          Your Honor, we sought to meet and confer with

2     plaintiffs.  We had a meet-and-confer with them on Friday

3     afternoon.  We had scheduled that.  Two hours before that

4     meet-and-confer, they presented us with 20 documents that they

5     thought might be important to help resolve the dispute.  We

6     informed plaintiffs that we could not review those 20 documents

7     in such a short time before the meet-and-confer, but we would

8     be prepared to go ahead with it anyway.  Plaintiffs suggested

9     that we adjourn until Monday the meet-and-confer.

10          We reviewed the documents over the weekend and in

11     informed plaintiffs on Monday that we did not believe that the

12     documents that they produced at all resolved the dispute.  Some

13     of those documents, it is not even clear that they relate to

14     AULII.  I have a small sample in case the court would like to

15     review some of them.  But the dispute was not resolved.

16          We sought from plaintiffs an explanation as to why

17     they did not believe, given our submission to your Honor on May

18     25, that we were entitled to the mortality and valuation

19     documents that we sought, particularly given their

20     representations in prior meet-and-confers that they did not

21     have mortality assumptions, and plaintiffs either could not or

22     would not talk to us about why they thought the analysis that

23     we presented to the court was an appropriate manner in which to

24     proceed for us to analyze their mortality assumptions and

25     attempt to derive them from a broader set of documents.

i6d2efgC

1          Late last night, at about midnight, Mr. Teshima sent

2     us two more documents, requesting that we review them and let

3     him know whether we would reconsider our request.  Those

4     documents were similarly insufficient to ameliorate our

5     concerns.  So, regrettably, your Honor, we are still at

6     impasse.

7          THE COURT:  Did the meet-and-confer actually happen at

8     some point?

9          MS. RAPPAPORT:  The meet-and-confer happened on Monday

10    afternoon.

11         THE COURT:  Mr. Teshima.

12         MR. TESHIMA:  Thank you, your Honor.

13         First of all, there have been meet-and-confer efforts,

14    as Ms. Rappaport describes, and I think the real impasse, your

15    Honor, is a misunderstanding of the terms that we are using.  I

16    know this was discussed a bit at the conference in front of

17    your Honor a few weeks ago, and that has to do with the

18    mortality and valuation documents, as Ms. Rappaport just

19    described.

20         We have told your Honor and we told plaintiffs that

21    the plaintiffs, as the plaintiffs' investors, we don't perform

22    the valuation -- excuse me, the mortality assumptions that AXA

23    did as a life insurance company.  Instead, they pointed to

24    these individual life expectancy reports which your Honor

25    correctly recognized might be potentially relevant if there was

i6d2efgC

1    an extrapolation to be done to find those mortality

2    assumptions.  But you asked why they couldn't just skip the

3    mortality, the extrapolation step and go to the mortality

4    assumptions.

5            The documents that Ms. Rappaport has referenced were

6    our attempts to identify for the defendant documents which we

7    believe, frankly, moot any of this extrapolation step at all.

8    The documents that I did provide late last night are EFG

9    documents that discuss mortality assumptions that they had

10   prepared for them by a third party that they believe identifies

11   the mortality base table, the 2008 VBT.  So there are these

12   documents.

13           Now, the reason we did not have those prior to the

14   conference with your Honor in April was because these are among

15   the documents that were in Switzerland that we did produce on

16   June 8 and complies with your Honor's order.  And if I might

17   just address that issue about the documents in a moment from

18   Switzerland, I would appreciate that.

19           But just to wrap up the meet-and-confer, we have gone

20   through an effort to identify in our production exemplar

21   documents for AXA to demonstrate that, to the extent they

22   believe they need mortality -- quote, mortality valuations from

23   the plaintiffs -- and we, again, dispute that that's relevant

24   to a reasonableness assessment of their cost of insurance

25   increase in September 2015; but, nevertheless, we have tried to

1    identify to moot this issue.  They have persisted, and I think

2    the reason is because they wish to have the individual life

3    expectancy reports which your Honor recognized at the last

4    hearing are not really relevant to this analysis of the

5    reasonableness of their mortality assumption which was based on

6    actual to expected performance over tens of thousands, if not

7    hundreds of thousands, of policyholders.

8          THE COURT:  Okay.  So, again, I think the devil may be

9    in the details.  To take AXA's letter of May 25 as our sort of

10   guide here, in particular I am looking at Exhibit D to that

11   letter, which is AXA's attempt to sort of explain to me how

12   they would propose to use the sort of policy level data or

13   documents, if I can call it that, to extrapolate the mortality

14   assumptions and mortality tables that plaintiffs used, I guess

15   what I am struggling with, it strikes me, and I certainly hear,

16   Mr. Teshima, that you may think otherwise, but I rejected that

17   argument at the May 8 conference.  It seems to me that the

18   information AXA is seeking at the end of the paragraph

19   described as step two, namely, seeking to derive what mortality

20   assumptions and mortality tables were used by the plaintiffs in

21   evaluating these insurance policies, that they are entitled to

22   that, full stop.

23          So the question to me is how to get it, and that's,

24   again, where the rubber hits the road, the devil is in the

25   details, whatever metaphor or cliché you want to use here.

i6d2efgC

1        I was hoping that, based on our conference in May, you

2   would figure out essentially what documents you could produce

3   that would provide them with that information without

4   necessarily requiring you to produce policy level documents

5   which I agree, on their face and in a vacuum, are not

6   necessarily relevant and raise privacy issues and raise burden

7   issues.

8        But it seems to me what you are telling me is that you

9   think you have actually done that and what they are telling me

10  is that you haven't; and short of looking at the documents and

11  hearing argument about it, I don't know how I'm meant to

12  resolve that.  And if I agree with them, I think ultimately you

13  have given me no choice but to say that they are entitled to

14  all of the documents they are seeking at the policy level as

15  well.  I just don't know what to do here.  It seems you are

16  talking past each other, and that's where I am at a

17  disadvantage.

18        MR. TESHIMA:  May I respond briefly, your Honor?

19        THE COURT:  Sure.

20        MR. TESHIMA:  Thank you.

21        THE COURT:  Let me say one last thing, which is, that

22  I find it a little hard to believe, I mean, correct me if I am

23  wrong, I'm not an expert in these matters, but it strikes me

24  that you all purchased these policies as investments and, in

25  doing so, obviously made a calculus and made a determination

i6d2efgC

1    that it was a wise and sound investment, which presumably means

2    that you made a determination that essentially the likely

3    payout exceeded whatever the costs that you were going to

4    incur, *i.e.*, the costs of insurance were.

5           It strikes me that, if that assumption is correct --

6    and it has to be, I would imagine -- there is some evaluation

7    or analysis that was conducted with respect to the mortality

8    assumptions or risks than underlay the pricing of the policy.

9    If that is the case, it strikes me that there have to be

10   documents that go to the heart of what they are seeking and

11   that I think they are entitled to.

12          So that's what I am puzzling over and trying to figure

13   out.

14          MR. TESHIMA:  Thank you.

15          THE COURT:  Now you may respond.

16          MR. TESHIMA:  Thank you, your Honor.

17          Your Honor, I think you are right that the parties are

18   speaking past each other, in this sense.  I would say there are

19   two buckets of documents we are speak about.  First, there are

20   industry mortality tables that then base these mortality

21   assumptions that AXA has used for its 2015 cost of insurance

22   case.  And then there are the individual life expectancy

23   reports as to any particular policyholder, and your Honor is

24   correct that it would make sense that, in evaluating the value

25   or investment value of an individual life insurance policy, you

i6d2efgC

1      would look at the individual life expectancy for that

2      individual, applying some industry standard mortality

3      assumptions, to get an expected value or return on that

4      individual policy for that individual policyholder and his or

5      her health conditions, age, etc., other characteristics.

6              That tells you nothing about the reasonableness of a

7      mortality assumption that AXA, again, used in creating its cost

8      of insurance increase in 2015, again, using its actual to

9      expected information over hundreds of thousands of

10     policyholders.  So even if it is by chance that one individual

11     policyholder today, those mortality assumptions line up somehow

12     to be the same as the mortality assumptions used by AXA in

13     2015, that still doesn't tell you anything about the

14     reasonableness or unreasonableness of their cost of insurance

15     increase based on what they claimed was adverse mortality

16     experience.

17             So, your Honor, when you have these two buckets, we,

18     EFG, have committed to your Honor and told the plaintiffs --

19     excuse me told AXA, the defendants, that we would produce these

20     mortality assumption information to the extent we have them.

21     And as we have now learned in our production from Switzerland,

22     we have such documents.  They are performed by third parties.

23     Those are among the documents I provided to counsel last night.

24     We are committed to producing those.  My partner Mr. LaQuang

25     committed to your Honor at the last hearing that those

i6d2efgC

1    mortality assumption documents, we have no problem, we are

2    going to produce them.

3         THE COURT:  Why have they not already been produced?

4         MR. TESHIMA:  Your Honor, to the extent they exist for

5    EAA plaintiffs, the documents not in Switzerland, we believe

6    they have been produced.  They are among the documents that --

7    the 20 documents that Ms. Rappaport referenced.  We have a

8    disagreement among the parties about whether there is or isn't

9    mortality assumptions and, frankly, your Honor, I think that is

10   not because of what we have produced but, frankly, AXA's view

11   of what it wants to see.  We did not perform a life insurance

12   mortality assumption analysis that this life insurance company

13   did when it performed its cost of insurance increase.

14        But on the EFG documents, your Honor, if I might just

15   touch on these from Switzerland for a moment, we did just

16   produce those in response to your Honor's order directing us to

17   do so.  I do want to make clear, your Honor, that EFG was

18   attempting to comply both with your Honor's orders -- we

19   understand the motions for reconsideration had been denied.  It

20   also, as you know, was very concerned about potential criminal

21   liability under Swiss law, Article 271, concurrent with your

22   Honor's order to make the production.  On June 8 we received

23   guidance from an opinion from the Ministry of Justice from the

24   Swiss authorities saying that in their opinion it would not be

25   a violation to comply with your Honor's order, subject to

i6d2efgC

1    certain redactions under Swiss privacy law, which we have done,

2    and we have informed the plaintiffs that we have now received

3    an opinion from our Swiss counsel that we may unredact those

4    documents without running afoul of the Swiss privacy law.  So

5    we are going to complete that.

6           So that's why, your Honor, it took so long.  We were

7    not feet-dragging, with all due respect.  We were trying to

8    both comply with your Honor's orders, considering options in

9    light of those orders procedurally, but then also doing all we

10   could to address the issue with the Swiss authorities.  We

11   heard back from the Swiss authorities.  They had said, Had you

12   gone through the Hague Convention, there would be no need for

13   redactions, there would have been no need for this at all.  But

14   they understood, because AXA did not want to go through the

15   Hague Convention, we had to make this waiver application, which

16   they then deemed unnecessary given the situation here.

17          THE COURT:  All right.  It might have been helpful to

18   know all of that before you briefed the motion here, but that's

19   neither here nor there at this point.

20          So are you representing to me that to the extent that

21   you have in your possession documents that fall within

22   essentially the category of documents that would be responsive,

23   if I can use that term here, to the sort of second part of the

24   step two paragraph of Exhibit D, that you have and/or will very

25   shortly turn those over?

i6d2efgC

1              MR. TESHIMA:  Yes, your Honor.  We have produced this

2     baseline mortality table.  We have produced information about

3     mortality assumptions.  So we have done it.  My understanding

4     is -- I identified a couple of examples for Ms. Rappaport.  I

5     don't know that those are all the documents.  Those are just

6     examples in the -- I believe over 4700 documents we produced on

7     Friday.  We do not have, obviously, individual assumptions

8     regarding individual life expectancy reports, which is very

9     different, but these mortality assumptions, which I think they

10    are trying to solve for, to the extent they exist in our

11    production -- and we have provided two examples -- they have

12    been produced.

13              THE COURT:  Okay.

14              Ms. Rappaport, tell me why that doesn't suffice.  At

15    least it may be that there are some additional documents that

16    need to be turned over; but, when push comes to shove, I can't

17    make them turn over documents that don't exist.  It sounds like

18    they are making a representation that that is ultimately what

19    lies at the heart of your step two, which is what I think you

20    are entitled to in the abstract.  I don't think you are

21    entitled to the policy level life expectancy calculations or

22    assumptions, and it strikes me that you are entitled to the

23    aggregate ones that they are using; and if they represent that

24    they have given those to you, why doesn't that suffice, at

25    least for now, subject, of course, to your right to come back

i6d2efgC

1    to me if, after deposing someone, you find out that there is

2    more to it than that or what have you?

3              MS. RAPPAPORT:  So, your Honor, obviously we have not

4    been through the 4700 documents that plaintiffs produced only

5    on Friday, but the 20 examples that they provided to us as ones

6    that they thought we should look at as well as the two last

7    night do not do the job.  Just five examples that I can point

8    to, your Honor -- and I have copies here today if your Honor

9    would like to take a look at them --

10             THE COURT:  Sure.

11             MS. RAPPAPORT:  Your Honor, may I approach?

12             THE COURT:  You may.  You can give them to my deputy.

13   I assume you have copies for Mr. Teshima.

14             MS. RAPPAPORT:  Yes.

15             Your Honor, again, these are five examples that

16   plaintiffs -- of the 20 that plaintiffs suggested we look at on

17   Friday.  They do not include the two documents that were

18   produced last evening, which I can address separately.  I would

19   also note for the record, your Honor, that these documents are

20   marked confidential pursuant to the protective order in this

21   case, and I would be happy to work with Mr. Teshima subsequent

22   to the conference in order to discuss with them how to

23   appropriately get them in the record here because they are

24   marked confidential.

25             THE COURT:  All right.  We will probably take you up

i6d2efgC

1    on that, but let's table that for a moment and tell me why

2    these --

3              MS. RAPPAPORT:  So, your Honor, tab 1 of these

4    documents is some agreed-upon procedures that appear to be part

5    of an independent accountant report.  The report mentions the

6    term "mortality" on a single page.  That's page 1.  It is 1B.

7    It says "mortality tracking."  And this is only in the context

8    of tracking whether or not an insured person is deceased or his

9    or her address changed.  There is nothing in this document that

10   refers at all to mortality assumptions and the document does

11   not even mention AULII.

12             If I can move on to tab 2, this is a document that

13   mentions mortality, but only in the context of whether

14   churchgoers generally have better mortality than

15   nonchurchgoers; and while this is responsive to our request,

16   because it has some relevance to mortality rates, it tells us

17   nothing about the specific mortality assumptions that

18   plaintiffs used, considered, or relied upon for their block of

19   AULII policies, and it doesn't even mention AULII.

20             THE COURT:  What is this document?

21             MS. RAPPAPORT:  Your Honor, this is the way in which

22   it was produced to us.  This is one of the documents that

23   plaintiffs pointed us to in the context of the meet-and-confer

24   process.

25             THE COURT:  Okay.

i6d2efgC

1          MS. RAPPAPORT:  Tab 3, your Honor, is demographic

2   information for a certain pool or portfolio policies as of

3   2003.  That's before AULII was even sold.  So not clear how

4   this relates at all to AULII.  The only mortality-related

5   reference in this document is that smokers have twice the

6   mortality of nonsmokers and people who practice religion have

7   30 percent lower mortality, again, some relevance to general

8   mortality rates, but nothing about mortality assumptions

9   applicable to AULII.  It doesn't mention AULII.  And, again, as

10  I said, it was -- precedes the issuance of AULII.

11         THE COURT:  I think I'm going to increase my synagogue

12  attendance, though.  All right.

13         MS. RAPPAPORT:  Tab 4, your Honor, is an Excel

14  spreadsheet.  It is described as a service or settlement report

15  for Charity 1 Funding LLC.  It reports about mortality rate

16  experience but doesn't indicate anything about assumptions

17  about future mortality, nor does it indicate that it is related

18  to AULII.

19         And the last document that we provided as a sample --

20         THE COURT:  Let me interrupt you for a moment because

21  maybe there is something I am misunderstanding, but why would

22  the documents that, again, for lack of a better way of putting

23  it, would be responsive to your step 2 paragraph, why would we

24  expect them to be specific to AULII as opposed to just

25  generally being mortality-related assumptions or tables that

i6d2efgC

1    then they could apply to an AULII policy?

2           MS. RAPPAPORT:  So because the mortality assumptions

3    that plaintiffs -- that plaintiff would be applying would be

4    relevant to a particular group of insureds and a particular

5    insurer.  It wouldn't -- the broader mortality documents are

6    not necessarily applicable to AULII.  Indeed, the life

7    expectancy reports that -- or the two that plaintiffs produced

8    to us specifically identify the insurer and relate specifically

9    to AULII pool.

10          THE COURT:  Okay.  Tab 5?

11          MS. RAPPAPORT:  Tab 5 is -- it discusses plaintiffs'

12   use of an industry standard table and certain adjustments made

13   to that table for the Charity funding portfolio.  This document

14   is dated February 1, 2016, which is subsequent to the COI

15   adjustment announcement, so not even clear that it relates to

16   any mortality assumptions that would have applied during the

17   period when AXA was making its determination to change its

18   mortality assumptions -- change its COI.  I'm sorry, your

19   Honor.

20          With respect to the documents that were produced last

21   evening, your Honor, and I can hand up copies of those as

22   well. . .

23          (Pause)

24          MS. RAPPAPORT:  With respect to the document that's

25   Bates stamped EFG 16865 through 16871, this document purports

i6d2efgC

1    to show how EFG might have valued their in-force book of life

2    settled policies, and it tells us what base table they were

3    using.  But it's at a particular point in time.  We don't know

4    if this relates to AULII.  It doesn't tell us how EFG viewed

5    mortality at the time the policies were purchased.  It doesn't

6    tell us whether the policies they are valuing using this method

7    includes AXA policies.  And although it might reference a base

8    table that they were relying on, the 2008 VBT, it doesn't tell

9    us anything about the multipliers, scalers, or any adjustments

10   they were making to that base table.  And so, your Honor, from

11   these documents, without -- the life expectancy reports are

12   not -- those were the documents that plaintiffs were using to

13   value their policies.  These are documents that are separate in

14   their files and may have general discussions about mortality

15   tables, but they are not the specific documents that plaintiffs

16   were using or relying on when determining what mortality

17   assumptions should be applied to AULII policies, and that's

18   what we seek to derive from the life expectancy reports and

19   underlying valuation documents that accompanied those.

20          In the second document which is Bates stamped EFG

21   16872 to 16886, again, this provides information about the base

22   table and adjustments that they are making to that or suggested

23   adjustments, as this is a report that, as I read it, suggests

24   potential changes to how they should be looking at their

25   policies, not how they are actually looking at them.  It

i6d2efgC

1    doesn't tell us how plaintiff viewed mortality at the time the

2    policies were purchased, and it is doesn't tell us whether the

3    policies they are valuing in this document or discussing in

4    this document even include AXA policies.  So even if we have

5    plaintiffs' base table and adjustments to them, we still need

6    the underlying documents, including the life expectancy reports

7    and medical records and mortality analyses of those individual

8    policies to do an appropriate apples-to-apples comparison to

9    the assumptions that AXA was applying to its AULII policies and

10   the assumptions that plaintiffs were applying either because

11   they generated them themselves or they relied upon assumptions

12   that were incorporated in life expectancy or other valuation

13   documents in order to do an appropriate comparison and make

14   this apples-to-apples comparison.  So we need to understand how

15   plaintiffs determined what underwriting class or class of

16   health their insureds fell into so that AXA can extrapolate and

17   compare information as to how AXA would have evaluated that

18   insured and compare one set of mortality assumptions to

19   another.

20         So, again, your Honor, these are the examples that

21   plaintiffs pointed us to or a handful of them, and they are

22   simply not adequate for us to perform the analysis that is set

23   forth in our exhibit to our May 25 letter.

24         THE COURT:  How many policies are we talking about?

25         MS. RAPPAPORT:  107 policies across all plaintiffs in

i6d2efgC

1    the EFG action.

2              THE COURT:  And why, going back to something that I

3    had proposed at the last conference, why wouldn't some sort of

4    sampling approach be an acceptable compromise that would

5    minimize the intrusion on privacy and the burdens on the

6    plaintiff but allow you to essentially extrapolate from a

7    representative sample whatever data you can extrapolate?

8              MS. RAPPAPORT:  First, your Honor, with respect to the

9    burden, the arguments that were made by plaintiffs at the

10   conference before your Honor were subsequently modified in

11   meet-and-confers and as explained to us the burden is quite

12   minimal with respect to providing these documents.

13             Plaintiffs have told us they would have to review 200

14   documents per policy, not saying how many they think would be

15   produced.  But if they reviewed 200 documents per policy and

16   they have said that many of those policy files contain

17   documents that apply across policies, it would likely be a lot

18   less than 200 per policy that they would have to review.  So I

19   don't think that there is a burden issue here.

20             But on the assumptions side, they are not providing us

21   with the assumptions that underlie those life expectancy and

22   valuation reports.  These are a hodgepodge of documents

23   contained in their files about mortality tables that they may

24   be applying to certain policies without the application of any

25   particular scalers.  We don't know if these apply to AULII

i6d2efgC

1  policies, and a sampling is just not workable in that respect.

2            THE COURT:  Mr. Teshima, back to you.  You can tell

3  me, what is the burden here?  How many documents are we talking

4  about?  Do you agree there are 107 policies and how many

5  documents would you have to review per policy?

6            MR. TESHIMA:  Your Honor, we do agree to the number of

7  policies.  The burden argument that Ms. Rappaport referenced

8  are the fact that there are some overlapping documents within

9  each policy which then would shorten down the list from

10  approximately 3,000 documents down to perhaps 2 or 300

11  individual documents for each policy.

12            The issue and burden here, your Honor, is that we are

13  going up against the shifting request, so we are asked to

14  provide samples.  We spend multiple hours of time by our team

15  to find these examples.  We produce the examples to the

16  plaintiff.  Rather than respond and say they are insufficient,

17  they filed a letter brief with your Honor saying, We can't do

18  this.  Sampling has proved unworkable.  Nothing they are going

19  to give us is going to satisfy us that sampling works.

20            So, your Honor, in AXA's letters to the court, they

21  said sampling is not going to work.  So, instead, we are left

22  with this burden of trying to find documents that will never

23  satisfy AXA.  When we provide the mortality assumptions, as

24  they asked for in step 2, as read in the example that

25  Ms. Rappaport handed up to your Honor, we talk about the 2008

i6d2efgC

1    valuation basic table that we use as a mortality table.  We

2    tell them that we use them.  It says it was used by plaintiffs.

3    They say, well, that's not good enough, because it is not what

4    you used at the time of acquisition.  Well, that was back in

5    2007.  So why would they need that to help them understand the

6    reasonableness of their cost of insurance rate in 2015?  And

7    then they say it's not good enough because it doesn't reference

8    the particular policies.  Well, I'm confused because I thought

9    they were trying to revert back and extrapolate to a general

10   aggregate mortality base table and any adjustments we have made

11   in assessing these policies.  That's what we have done.  We

12   have produced it.  And now they say that's not enough.  We need

13   the individual mortality assumptions.  We need all the health

14   information to make this assessment.

15          And, your Honor, respectfully, this methodology that

16   they have crafted is not going to help the trier of fact

17   understand the reasonableness of their cost of insurance

18   increase at all.  It is undisputed.  These extrapolated

19   mortality assumptions they are trying to create, they weren't

20   used by my client.  They weren't used by AXA at the time.  They

21   are just saying, We are going to redo this and come up with a

22   new number, and we will reference to what we did in 2015 and

23   see if it is reasonable.  That's not going to help the trier of

24   fact understand whether or not AXA complied with its policies

25   and based its cost of insurance increase based on increased

i6d2efgC

1    mortality that it actually experienced.

2              So we would say, your Honor, the sampling, we would

3    agree with plaintiffs it is not going -- defendant, excuse me,

4    is not going to work, and also it is going to lead to

5    irrelevant information.  So it's both burdensome and not

6    probative of the issues here.

7              THE COURT:  Well, your view is that giving them any

8    policy level information or documents would be not helpful to

9    the trier of fact, I take it.  My question is why not split the

10   difference and say, fine, defendants pick 25 policies and you

11   will provide all responsive documents with respect to those

12   policies?  What's the problem with that approach?  It kicks the

13   can down the road a little bit, perhaps, whether this stuff

14   ultimately is admissible, relevant, helpful, but it allows them

15   to do whatever analyses they think they can do from it and it

16   at least gets us past this impasse.

17             MR. TESHIMA:  Your Honor, the issue is that we would

18   have to undertake this burden whether it is 200 documents per

19   policy, 3,000 documents per policy, to look to see or frankly

20   to demonstrate to AXA that what they are asking for doesn't

21   exist, it was never relevant.  Having us do that just to try to

22   satisfy AXA that what they are looking for isn't relevant is an

23   undue burden to us and disproportional again to the needs of

24   this case.  This is not, at the end of the day, going -- the

25   decision about whether -- and the determination of whether

i6d2efgC

1  AXA's cost of insurance increase was reasonable or not is not

2  going to turn on some extrapolation from individual

3  policyholders' life expectancy reports that may have taken

4  place, as Ms. Rappaport acknowledged, well before or after the

5  cost of insurance increase.

6          THE COURT:  And the first five documents that

7  Ms. Rappaport presented to me do seem rather far afield from

8  what we are supposed to be getting at here, but last two strike

9  me as much closer to the step two paragraph that I have been

10  focusing on.

11          Can you represent that everything similar to this has

12  been produced?

13          MR. TESHIMA:  Your Honor, we have not completed our

14  close secondary review of the documents.  We produced the

15  documents to meet the court's deadline.  These are documents

16  that we pulled using the same search terms, so I assume that

17  the search terms hit and selected these documents.  They would

18  produce the others.  And the reason why the first five may not

19  be exactly what plaintiff -- the defendant is looking for is

20  that these are the EAA documents; and recall that, for the EAA

21  policies, these were acquired through West LB subsequent to the

22  foreclosure of that bank.  There wasn't an individual valuation

23  done.  This was an acquisition of a portfolio of the life

24  insurance policy.  So we have done our best to provide some

25  documentation that describes mortality.  The answer is there

i6d2efgC

1    may not be this answer for the EAA trust.  There are already

2    these documents for EFG.  We have produced them.  The two

3    examples that your Honor has looked at today demonstrate that

4    we are producing documents that go to this aggregate mortality

5    assumption.

6            If, at the end of the day, they complete their review

7    of the documents we have produced and they say, These are the

8    only two, we are happy to come back, talk about search terms

9    again, but I suspect these are not the only two.  We were able

10   to quickly find these as examples to bring to Ms. Rappaport's

11   attention prior to the hearing.

12           THE COURT:  All right.  We have to begin to wrap this,

13   up but Ms. Rappaport?

14           MS. RAPPAPORT:  First, your Honor, there have not been

15   agreed upon search terms as plaintiff well knows because we

16   sent them a lengthy letter.  They have narrowed their search

17   terms based on the narrow scope that they sought to collect

18   without regard for the present dispute.  So I am not at all

19   agreeing that the scope of what they have even collected and

20   reviewed so far is at all adequate.

21           But I think what plaintiffs -- the important thing

22   that plaintiffs have told you today is that there is no

23   meaningful burden.  AXA has produced probably 80,000 documents

24   by this point and reviewed many hundreds of thousands more and,

25   given that there are $560 million in face value in these

i6d2efgC

1    policies and these are financial institutions that are suing

2    AXA, there is no reason why they cannot review these documents.

3    There is no burden, disproportionate burden here that

4    plaintiffs would suffer.

5            The second point is, your Honor, this case is about

6    the reasonableness of AXA's mortality assumptions, and clearly

7    the mortality assumptions that were incorporated in documents

8    that plaintiffs relied upon, considered, or developed in

9    connection with the acquisition of an interest in these

10   policies is extremely relevant to whether AXA's mortality

11   assumptions were at all comparable so that we can make an

12   argument as to whether these were reasonable in light of what

13   plaintiffs were looking at.  This is not a sampling exercise,

14   your Honor, that plaintiffs are implying that we are taking on

15   because -- or that we are saying is insufficient because we

16   feel like going on these discovery disputes.  But, your Honor,

17   it was based on a representation or at least an understanding

18   that I had and I believe that the court had at the last

19   conference that we were going to get the mortality assumptions

20   that underlie each of those life expectancy reports.  That's

21   not what these documents are.  These are documents about

22   mortality and about mortality tables that reside in plaintiffs'

23   files, but these are not the mortality tables and assumptions

24   that are underlying the reports that plaintiffs have produced

25   to us with respect to the AULII policies; and without those

i6d2efgC

1    mortality assumptions, we cannot perform this exercise of

2    determining what the broader set of mortality assumptions that

3    plaintiffs were using with respect to these AULII policies, and

4    that's why we need a broader set of policy documents, so that

5    we can derive what we believe were the assumptions that

6    plaintiffs are relying on and we can compare them to those of

7    AXA and make an argument that AXA's assumptions were more than

8    reasonable.

9            THE COURT:  All right.  I think I have heard enough at

10   least for now.  I'm not sure this is going to ultimately

11   satisfy anybody, but here is where I think we are:

12           I am not persuaded that AXA should get the policy

13   level documents.  At the end of the day, I think what is

14   clearly, in my view, relevant and to which AXA is entitled is

15   essentially again what is at the heart of the step two

16   paragraph in Exhibit D of the May 25 letter.

17           What I hear is that plaintiffs are producing or have

18   produced anything that sort of falls within that category, and

19   that ultimately I think is what AXA is entitled to.  The policy

20   level documents and data strike me as a roundabout way of

21   getting there, and ultimately strike me as not proportional to

22   the needs of the case, not only because I think there is a

23   burden but, when push comes to shove, I think really it is

24   several steps removed from what is at the heart of this case,

25   namely, the reasonableness of AXA's assumptions.  I think to

i6d2efgC

1    the extent that there are parallel assumptions in the custody,

2    control, or possession of the plaintiffs, that AXA is entitled

3    to them.  But I don't think that the -- at least right now I

4    don't think that the policy level sort of expectancy

5    calculations made with respect to an individual insured

6    ultimately are probative enough of that issue to warrant

7    disclosure at that level.

8            It sounds to me like (a) the plaintiffs may not have

9    produced everything that would fall within the scope of the

10   broader category and (b) defendants haven't yet gone through

11   everything that has been produced.  It may be that the

12   plaintiffs haven't actually fulfilled their obligations in that

13   regard.  That, to me, is a different question and strikes me as

14   a different problem than whether they should be required to

15   produce the policy level documents and information.  Again, I

16   think requiring them to do that is a roundabout way of ensuring

17   that they have complied with their obligations to do what I

18   think that they need to do, which is, produce the aggregate

19   level assumptions that went into whatever decisions they made.

20           All of which is to say, I'm not going to require the

21   plaintiffs to produce the policy level documents at this time.

22   I think they should continue to go through whatever they have

23   and ensure that they have produced anything that could

24   conceivably fall within the broader aggregate level category.

25   Defendants should review whatever has been produced and

i6d2efgC

1    obviously when it comes time for depositions, I think questions

2    can be asked of the folks who handled these things for the

3    plaintiffs about whether there are any other sorts of documents

4    and/or what sorts of assumptions were made as applies to

5    individual policies and the like.  If it turns out that there

6    are materials that were not produced that should have been

7    produced, then the plaintiffs are going to have to answer to

8    that.

9            But at the end of the day, I think that requiring them

10   to produce the individual policy level documents is really not

11   an appropriate way to get at what AXA is ultimately entitled to

12   and may well already have.

13           I think that presumably answers or may answer the

14   entitlement to interrogatories 5, 7, and 9 as well.  I am happy

15   to engage in a separate colloquy regarding that if you think it

16   doesn't, but I would think, again, to me, that the relevance of

17   who engaged in an analysis of the actuarial particulars of an

18   individual insured isn't necessarily relevant, but to the

19   extent that somebody would have engaged in that analysis at the

20   aggregate level, I think that clearly is relevant.

21           Ms. Rappaport.

22           MS. RAPPAPORT:  Your Honor, just to clarify, to the

23   extent that the plaintiffs relied upon reports from third-party

24   consultants, vendors, just third parties that provided them

25   with life expectancy reports and those vendors, consultants,

i6d2efgC

1    advisors, whoever they may be, used aggregate mortality

2    assumptions and aggregate information in assessing the life

3    expectancy of a particular individual or in coming up with a

4    mortality assumption in that particular report, it is our view

5    that we should be able to seek that information.  Because

6    plaintiffs are saying it is not in their possession, aggregate

7    information may be in the possession of other outside

8    consultants and advisors who did provide that information to

9    the plaintiff, and we believe, for that reason, we should be

10   able to get the identity of those consultants.

11           Even one of the documents, your Honor, that I handed

12   up to you today is from a company called Maple Life Analytics.

13   That would be something that would fall within the category, I

14   think, of our interrogatories, but plaintiffs have refused to

15   identify them to us, even though they believe they are

16   producing documents that were provided to them from this

17   company.  So this is what we are seeking so we can see what the

18   aggregate mortality assumptions that were incorporated in the

19   documents that were provided to plaintiff actually were.

20   Plaintiffs don't have that information.  We should be able to

21   get that elsewhere.

22           THE COURT:  If I understand you correctly, I agree.  I

23   think if hypothetically they outsourced the analysis to some

24   third party that basically took mortality tables or assumptions

25   and applied those to a particular policy and then came back and

i6d2efgC

1      said this is a good policy to invest in because we think it is

2      underpriced or what have you, I would think that you are

3      entitled to know what those assumptions and tables were even if

4      they are not necessarily in the custody of the plaintiffs.  But

5      how that works in practice, whether you need to serve a

6      third-party subpoena or they would be in the custody and

7      control of the plaintiffs, I don't know.  Again, this is

8      getting further into the weeds than I think I can get at the

9      moment.

10             MS. RAPPAPORT:  Your Honor, we would certainly like to

11     subpoena these entities, but plaintiffs are not -- have refused

12     to answer the interrogatories where we have sought the identity

13     of those entities or individuals, which is why we,

14     unfortunately, had to come back to your Honor to request

15     further relief.  So we would request that your Honor require

16     plaintiffs to respond to interrogatories 5, 7 and 9.

17             MR. TESHIMA:  Your Honor, may I respond briefly?

18             THE COURT:  Briefly, yes.

19             MR. TESHIMA:  Your Honor, interrogatories 5, 7, and 9,

20     as written today, not only go to the individual life expectancy

21     information that your Honor has just denied their request for,

22     it also says "all individuals."  It's over broad.  As we have

23     stated, if defendant wants to reframe their interrogatories in

24     light of the court's order today, we are happy to consider it.

25     It is not that we are not disclosing the information.  I just

1    produced a document that shows Maple Life Analytics.  That's

2    now a group, a vendor we have demonstrated that we relied upon.

3    I don't know that I would agree that if they did anything that

4    never showed up or was given to our client that our clients

5    relied upon it is somehow relevant, but if AXA wants to reframe

6    their interrogatories to narrow the focus based on the court's

7    order today, we will consider it and meet and confer with them

8    on how to respond.

9              THE COURT:  Okay.  I hate to keep this going, but it

10   strikes me that that might be the way to go here and have you

11   guys try and resolve this in the next couple of days on the

12   theory that this has hopefully given you even more of a path to

13   a solution.  But I'm also trying not to be naive about it and

14   don't necessarily want you here next week again.

15             Ms. Rappaport.

16             MS. RAPPAPORT:  Your Honor, I don't know what further

17   narrowing could be done.  Interrogatory 7 seeks the identity of

18   individuals or entities who performed any actuarial or

19   financial analyses for the policies.  I don't know why the

20   identity of those individuals or entities cannot be disclosed.

21             Interrogatory No. 9 seeks the identity of employees of

22   plaintiff or consultants or service providers who conducted

23   mortality or life expectancy analyses for older-age insureds or

24   provided such analyses to the plaintiffs.  If they did those

25   life expectancy analyses, they clearly had aggregate mortality

1    assumptions that they were using.  That's referenced even in

2    the document that I handed up, your Honor, on page 16876.  That

3    vendor said, "While life expectancies are provided for

4    individuals, they are developed from expected patterns of

5    mortality of large groups of similar individuals."  That is the

6    kind of information we would be seeking from these third

7    parties, or if there are individuals at the plaintiffs that

8    have that, we would be seeking that from them, too.  So I'm not

9    sure what further narrowing need be done.

10           The other interrogatory, number five, seeks the

11   identity of individuals who reviewed any policy prior to

12   plaintiff's acquisition; and, again, I'm not at all clear why

13   that is something that plaintiffs won't provide to us, because

14   those individuals were clearly involved in determining whether

15   that was a good purchase or investment for plaintiff based on

16   largely whether the mortality -- the policies were underpriced

17   or not, and that is definitely a function of the mortality

18   assumptions that were being applied at the time.

19           THE COURT:  All right.  Mr. Teshima, why is that wrong

20   and why would it be hard to answer these?

21           MR. TESHIMA:  So, first, your Honor, on Interrogatory

22   5, the last one that Ms. Rappaport addressed, it is a separate

23   issue here.  We have responded.  We said that for EFG we were

24   unable to identify anybody, but we were continuing to evaluate

25   them.  This acquisition happened over a decade ago.  Based on

i6d2efgC

1    our investigation to date, we have not been able to identify

2    people that would be responsive to this request.  If it turns

3    out in these new documents we learn something new, we will

4    update our responses.

5            For Wells Fargo and the EAA plaintiffs, our response

6    was "none."  We are not aware of anyone that was involved in

7    reviewing these policies prior to acquisition, again, for the

8    reasons described on how the EAA acquired these portfolio

9    loans, that is after the foreclosure of West LP, and given

10   Wells Fargo's role as a securities intermediary and as trustee.

11           As to the other requests, 7 and 9, Ms. Rappaport

12   referenced some of the language in these interrogatories, but

13   there is a difference, and I think this really goes to the

14   heart of the matter that we were discussing earlier, the

15   difference between mortality assumptions and valuation.  Yes,

16   as investors, our clients did individualized valuations about

17   individual policies based on life expectancy.  That valuation

18   information, that interest margin, expected rate of return,

19   those are going to be totally different and distinct from

20   mortality assumptions.  These requests that they want to be

21   modified and focus on the aggregate level mortality assumptions

22   that we have been discussing today, those are very different

23   requests than as worded here.

24           Interrogatory 7 says "all individuals who performed

25   any actuarial or financial analysis relating to any policy."

1    Interrogatory 9 says "identify," and it lists a number of

2    people, "including all vendors who conducted, supervised, or

3    reviewed any analysis concerning the mortality or life

4    expectancy of individuals aged 65 or older."  Much broader than

5    the scope of documents that your Honor has agreed is relevant

6    here, which is the aggregate mortality assumptions.  We don't

7    dispute that that's what your Honor has said is relevant.  We

8    agreed.  That's why we have produced these documents that we

9    have discussed today.

10           THE COURT:  All right.  The problem is I think that

11   Ms. Rappaport is right that the folks who engaged in those

12   kinds of analyses had to do so using some sort of assumptions

13   or tables that relate to what we are talking about, namely,

14   mortality assumptions or mortality tables.  So I'm persuaded

15   that they are entitled to these.  You are to respond to these

16   three interrogatories promptly.  You can discuss what that

17   means with each other.  But I'm persuaded that that is the way

18   to go on that.

19           The last item raised by AXA is the e-mail issues, the

20   Wells Fargo e-mail issues.  As far as I'm concerned I put that

21   to rest at the May 8 conference at page 30 of the transcript.

22   I indicated that I would not take any action on that front at

23   this point, that is, that I would allow plaintiffs to rely on

24   what was in the FileNet system and their sort of document

25   retention policies and approach to make their productions, with

i6d2efgC

1    the caveat -- and a rather big caveat -- that if, based on

2    depositions or otherwise, the defendants gave me any reason to

3    believe that relevant and responsive documents had not been

4    produced in that manner, that I would revisit the issue and

5    perhaps even impose sanctions.

6            So given that, quite frankly, I think the plaintiffs

7    proceed at their peril by relying entirely on their FileNet

8    protocols.  I don't know what "substantive" means either,

9    but -- and it doesn't seem to me that we are talking about a

10   large number of custodians, and it sounds as if the plaintiffs

11   have already reviewed some of the custodians records enough to

12   know, for example, that three of the eight or so that we are

13   talking about don't have any responsive documents.  So I think

14   if I were sitting where the plaintiffs are sitting, and hearing

15   also that I have lost a little bit of patience, I would

16   probably err on the side of doing a more thorough review,

17   rather than relying solely on the FileNet system.

18           But the bottom line is, I did rule and address that at

19   the May 8 conference, and I see no base or reason to revisit it

20   at this time.

21           So, Ms. Rappaport, did you want to say something on

22   that score?

23           MS. RAPPAPORT:  Not on that score, your Honor.

24           THE COURT:  Okay.  Is there something else you want to

25   say?

i6d2efgC

1          MS. RAPPAPORT:  Yes.  Given that discovery is

2     proceeding and we are -- we have a tight schedule, would your

3     Honor consider providing a deadline for the plaintiffs to

4     respond to our interrogatories so we can issue appropriate

5     subpoenas, if necessary.

6          THE COURT:  Sure.  How about a week from Friday?

7          MS. RAPPAPORT:  That's okay with me, your Honor.

8          THE COURT:  All right.  Mr. Teshima?

9          MR. TESHIMA:  That deadline is fine, your Honor, but

10     may I just clarify the record that we have an order to respond

11     to the interrogatories as drafted.  We will do so.  But am I

12     correct that the scope of that response is, again, limited to

13     the type of -- the individuals who performed the type of or

14     relied upon the type of aggregate mortality assumptions we

15     described today and not any individual anywhere who may have

16     performed an individual valuation of an individual policy using

17     an individual's life expectancy report?

18          THE COURT:  No, because the point is that those

19     individuals undoubtedly, in doing that, used some sort of

20     aggregate level assumptions or tables to make those

21     determinations and calculations; and, regardless, I'm giving

22     defendant an opportunity to at least determine if in fact they

23     did or didn't, and that may ultimately get to the heart of the

24     issue.

25          So, no, I am not limiting them beyond or in any way,

i6d2efgC

1    and you are to respond by a week from Friday.

2              The last issue I just want to mention as a

3    housekeeping one, I have been reviewing -- and Mr. Nath should

4    be listening up here, because this relates more broadly -- I

5    have been reviewing your monthly submissions with respect to

6    discovery matters, and I'm hoping that the mere exercise of

7    requiring you to make those submissions is helping you work

8    through some issues.

9              Having said that, I trust that if there is anything

10   for which you need judicial involvement or intervention, that

11   you would raise that by way of a letter motion, as the parties

12   did here, and/or you would flag it in a way more prominent way

13   than simply including it on a 45-page chart.  So that is to

14   say, I'm skimming those and keeping abreast of things, but you

15   should be jumping up and down a little more than you have if

16   there is something that requires my involvement.

17             All right?

18             MS. RAPPAPORT:  Yes, your Honor.

19             MR. TESHIMA:  Thank you, your Honor.

20             THE COURT:  Anything, Mr. Nath?  Anything you want to

21   say or raise or are you good?

22             MR. NATH:  No, your Honor.  Thank you.

23             THE COURT:  All right.  Very good.  In that case we

24   are adjourned.

25             I'm hoping that this puts an end to this matter, but I

i6d2efgC

1   recognize it may not.

2           Thank you.

3           MS. RAPPAPORT:  Thank you, your Honor.

4           MR. TESHIMA:  Thank you, your Honor.

5           THE COURT:  Oh, one last thing.  I said we would take

6   up the sealing question later.  Why don't you meet and confer

7   about that and let me know within a week how you propose to

8   deal with that.  I do think that these should be made part of

9   the public record in some fashion since obviously I did rely on

10  them in making my rulings today.  I don't think that any

11  personal identifying information, not that there was any on

12  these, should be revealed; but, otherwise, I think you have a

13  sense of where I stand on those issues, so give me your

14  thoughts within a week.

15          Thank you.

16                             oOo

17

18

19

20

21

22

23

24

25